302 F.3d 928
 FIREMAN'S FUND INSURANCE COMPANY, a California corporation, Plaintiff-Appellant,
v.
CITY OF LODI, CALIFORNIA, Jack Sieglock, in his capacity as Mayor of the City of Lodi; Richard Prima, Jr., in his capacity as Enforcing Officer of Lodi Ordinance No. 1650; Randall A. Hays, individually and in his capacity as Lodi City Attorney; Michael C. Donovan, individually and in his capacity as Lodi Assistant City Attorney; Adam L. Babich, individually and in his capacity as Lodi Assistant City Attorney; Steven H. Doto, individually and in his capacity as Lodi Assistant City Attorney; Bret A. Stone, individually and in his capacity as Lodi Assistant City Attorney; John R. Till, individually and in his capacity as Lodi Assistant City Attorney; Zevnik, Horton, Guibord and McGovern, LLP, individually and in their capacity as Lodi Assistant City Attorneys; Fran E. Forkas, in his capacity as Enforcing Officer of Lodi Ordinance No. 1650, Defendants-Appellees.
Unigard Insurance Company, a Washington corporation; Unigard Security Insurance Company, a Washington corporation, Plaintiffs-Appellants,
v.
City of Lodi, Defendant-Appellee.
 No. 99-15614.
 No. 99-15802.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted April 7, 2000.
 Filed August 6, 2002.
 As Amended on Denial of Rehearing and Rehearing En Banc October 8, 2002.*
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Terry J. Houlihan, Bingham McCutchen LLP, San Francisco, California, for plaintiff-appellant Fireman's Fund Insurance Co.
 Dennis Zarazoga, Law Offices of Dennis Zarazoga, San Francisco, California, for plaintiffs-appellants Unigard Insurance Company and Unigard Security Insurance Company.
 Randall A. Hays, City Attorney, Lodi, California, and Michael C. Donovan and Cecelia C. Fusich, Assistant City Attorneys, Envision Law Group, LLP, Lafayette, California, for the defendants-appellees.
 Appeal from the United States District Court for the Eastern District of California; Frank C. Damrell, Jr., District Judge, Presiding. D.C. Nos. CV-98-01489-FCD, CV-98-01712-FCD.
 Before: PREGERSON, D.W. NELSON, Circuit Judges and MOSKOWITZ, District Judge.[1]
 PREGERSON, Circuit Judge.
 
 
 1
 This consolidated appeal of two separate actions requires us to consider the constitutionality of an innovative municipal ordinance enacted by the City of Lodi, California ("Lodi" or "the City") to remedy hazardous waste contamination within its borders. Fireman's Fund Insurance Company ("Fireman's Fund"), Unigard Insurance Company, and Unigard Security Insurance Company ("Unigard") (collectively "the Insurers") appeal from the district court's judgments in favor of Lodi in the Insurers' separate but related actions for declaratory and injunctive relief. Both Fireman's Fund and Unigard filed suit to prevent Lodi from enforcing the local ordinance, named the Comprehensive Municipal Environmental Response and Liability Ordinance ("MERLO" or "the Ordinance"), which permits the City to investigate and remediate the hazardous waste contamination of its soil and groundwater.
 
 
 2
 The Insurers allege that MERLO is preempted by the federal Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601-9675, and by various state laws including California's Carpenter-Presley-Tanner Hazardous Substance Account Act, ("HSAA"), Cal. Health & Safety ("H & S") Code §§ 25300-25395.15.[2] We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.
 
 I.
 BACKGROUND
 A. The Contamination of Lodi's Water
 
 3
 Lodi first detected the presence of tetrachloroethylene ("PCE"), in its groundwater in April 1989. PCE is a known carcinogen that is often used as a dry-cleaning agent.[3]
 
 
 4
 Groundwater is Lodi's sole source of drinking water and the primary source of water for agricultural use in California's Central Valley.
 
 
 5
 In 1993, the Department of Toxic Substances Control ("DTSC") of the California Environmental Protection Agency began investigating Lodi's PCE contamination. DTSC is the state agency responsible for ensuring that California's public health and environment are protected from the harmful effects of hazardous substances. See Cal. H & S Code §§ 25312, 25313, 25350-25359.8. DTSC is authorized to oversee the cleanup of hazardous waste sites by issuing remedial orders and by entering into agreements with "potentially responsible parties" ("PRPs" or "RPs") to facilitate remediation.
 
 
 6
 DTSC's investigation revealed that four small businesses were potentially responsible for the PCE-contaminated waste-water that migrated throughout Lodi by land disposal, sewer lines, and city water wells. One business, Lustre-Cal Nameplate Corporation ("Lustre Cal") — a manufacturer of color anodized and etched aluminum nameplates and labels — is insured by defendant Fireman's Fund. Another business, Busy Bee Laundry & Cleaners ("Busy Bee") — a dry cleaner — was a tenant of M & P Investments, which is insured by defendant Unigard. As a result of its investigation, DTSC listed the "Lodi Groundwater Site" as a state hazardous waste site beginning in fiscal year 1993-94.[4] This is significant because listed sites are subject to the "procedures, standards, and other requirements" of HSAA. Cal. H & S Code § 25356(d). After it listed the Lodi Groundwater Site, DTSC began an HSAA-authorized administrative action against selected PRPs, including Lodi, to address the soil and groundwater contamination.[5]
 
 
 7
 B. Lodi's Investigation and Remediation Strategy
 
 
 8
 In May 1997, Lodi and DTSC entered into a "Comprehensive Joint Cooperation Agreement" ("Cooperative Agreement" or "Agreement").[6] Under the Agreement, DTSC and Lodi agree to "coordinate and cooperate in a single and consolidated effort" to timely investigate and remediate the hazardous substance contamination affecting the City. Consistent with this joint effort, DTSC designates Lodi the "lead enforcement entity" in the cleanup of hazardous substances in and around the City. In exchange, Lodi agrees to "actively seek the input ... of DTSC in the settlement of any environmental enforcement actions" brought by the City pursuant to the Cooperative Agreement, and DTSC agrees "not to independently prosecute any claims [against PRPs] without the full cooperation of ... Lodi." Lodi also agrees either to clean up the contamination itself or to compel PRPs to do so.
 
 
 9
 In furtherance of remediation, the Agreement, at section VI.(A)(1), requires Lodi to:
 
 
 10
 utiliz[e], as appropriate, the full range of its remedial and regulatory injunctive and cost recovery authority under federal, state and municipal law, to compel the complete, timely, competent, cost-effective performance of the Work in full compliance with federal, state and local law, specifically including the NCP,[7] as appropriate. These enforcement efforts will include ... the prompt enactment and enforcement of a comprehensive municipal environmental response ordinance which shall enact into municipal law additional legal authorities to appropriately supplement the City of Lodi's already extensive environmental response authority under federal, state and local law....
 
 
 11
 (emphasis added). The Agreement further states that DTSC retains its authority under HSAA to oversee Lodi's investigation and remediation efforts, and to review and approve any remediation plan developed by the City.
 
 
 12
 Lodi acknowledges, as part of the Agreement, that DTSC "may have certain claims against the City of Lodi relating to the released Hazardous Substances, which arise from or relate to the City of Lodi's design, construction, operation or maintenance of the commercial, industrial and residential storm and sanitary sewer systems operated by the City." In light of this acknowledgment, Lodi agrees to reimburse DTSC for past and future response costs not to exceed $1,024,549.55, if those costs are not reimbursed by PRPs as a result of Lodi's investigation and remediation efforts. Nevertheless, Lodi continues to deny being a PRP. Indeed, the Cooperative Agreement between DTSC and Lodi specifically includes a section entitled "No Admission of Liability," in which Lodi expressly disclaims any admission of liability "arising from or relating to the City of Lodi's design, construction, maintenance, or operation of sanitary and storm sewer systems...."
 
 
 13
 In consideration for Lodi's agreement to reimburse DTSC, DTSC grants Lodi a "covenant not to sue with respect to claims arising from ... Lodi's design, construction, operation or maintenance of any storm or sanitary sewer systems." DTSC also agrees to protect Lodi from contribution actions under CERCLA, 42 U.S.C. § 9613(f)(2), and California's contribution statute, Cal.Code Civ. Pro. § 877, for "matters addressed" in the Cooperative Agreement.
 
 
 14
 On August 6, 1997, Lodi's City Council enacted the "comprehensive municipal environment response and liability ordinance" as required by the Cooperative Agreement. Ordinance 1650 — commonly known as MERLO — is the subject of this suit. It sets forth a comprehensive remedial liability scheme modeled on CERCLA and HSAA. MERLO specifically provides Lodi with municipal authority to investigate and remediate existing or threatened environmental nuisances affecting the City, and to hold PRPs or their insurers liable for the cost of the City's nuisance abatement activities. See generally MERLO §§ 8.24.010-8.24.090.[8]
 
 
 15
 In order to facilitate this effort, MERLO: (1) authorizes Lodi to demand the production of documents related to environmental contamination or to any PRP's ability to pay for investigation and abatement, id. § 8.24.050; (2) creates an administrative hearing process subject to judicial review to resolve liability issues, id. at § 8.24.060; (3) authorizes Lodi to initiate municipal enforcement actions against PRPs, id. at § 8.24.080; (4) authorizes Lodi to bring direct actions against insurers of insolvent PRPs that would resolve the PRP's liability and the insurers' coverage obligations in one proceeding, id. at § 8.24.090(B); and (5) creates a "Comprehensive Environmental Response Fund" to be used for the investigation and abatement of environmental nuisances in and around Lodi, id. at § 8.24.070.
 
 
 16
 MERLO is modeled on both CERCLA and HSAA, and it incorporates many of the standards employed by CERCLA and HSAA. For example, MERLO utilizes the CERCLA and HSAA definition of who may be considered a PRP, see MERLO § 8.24.040(A)(1), and, like CERCLA, imposes joint and several liability on PRPs. See MERLO § 8.24.040(E).
 
 
 17
 C. Procedural History of the Present Actions
 
 
 18
 As set forth above, this consolidated appeal involves two separate but related challenges to MERLO — one brought by Unigard, and a second brought by Fireman's Fund.
 
 
 19
 1. The Origins of the Unigard and Fireman's Fund Actions
 
 
 20
 In May 1998, Lodi filed an abatement action pursuant to its authority under MERLO against Unigard's insured, M & P Investments. Three weeks later, Unigard filed the present action in United States District Court for the Northern District of California. In its complaint, Unigard alleges that Lodi adopted MERLO in order to shift its own liability for the PCE contamination to the insurers of other PRPs. Unigard's complaint further alleges that MERLO: (1) violates the Supremacy Clause of the United States Constitution because it is preempted by CERCLA; (2) violates Article 11 of the California State Constitution because it is preempted by HSAA and California Insurance Code § 11580; and (3) violates the Contracts Clause of the United States Constitution.
 
 
 21
 Finding that Unigard's claims "have an insufficient connection to the Northern District of California," the District Court transferred the action to the Eastern District of California. All of Unigard's claims were dismissed prior to the transfer, with the exception of the federal and state preemption claims, and the federal contracts clause claim.
 
 
 22
 In August 1998, Fireman's Fund filed a similar declaratory and injunctive relief action against Lodi in the United States District Court for the Eastern District of California. In addition to naming Lodi as a defendant, Fireman's Fund also named: (1) Lodi's Mayor, Jack Sieglock, in his official capacity; (2) MERLO Enforcement Officers Richard C. Prima, Jr. and Fran E. Forkas in their official capacities; (3) Lodi City Attorney Randall A. Hays in his official and individual capacities; and (4) Michael C. Donovan and Zevnik Horton Guibord & McGovern, LLP (collectively, the "Law Firm"), private attorneys acting as assistant city attorneys for Lodi, in their official and individual capacities.[9] Like Unigard's complaint, the Fireman's Fund complaint alleges, inter alia, that MERLO: (1) violates the Supremacy Clause of the United States Constitution; (2) violates Article 11 of the California State Constitution because it is preempted by HSAA and California Insurance Code § 11580; and (3) impairs Fireman's Fund's right to contract under both the United States Constitution and the California State Constitution.
 
 
 23
 On August 24, 1998, Fireman's Fund, joined by Unigard, moved for a preliminary injunction prohibiting Lodi from enforcing MERLO. While the Insurers' preliminary injunction motion was pending, Lodi and its officers moved, in both actions, to dismiss the Insurers' complaints pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction, and Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. At the same time, Fireman's Fund filed a motion for partial summary judgment and for a permanent injunction to enjoin Lodi from enforcing MERLO.
 
 
 24
 After extensive briefing by all parties, the district court held a joint hearing on all motions in both cases on December 4, 1998. Following the hearing, the district court issued two written decisions, one in each action.[10]
 
 2. The Unigard Decision
 
 25
 In an unpublished decision, the district court found Unigard's claims ripe for review because "the content of [MERLO] is clear as are the City's intentions to enforce the Ordinance against Unigard." Unigard Ins. Co. v. City of Lodi, No. Civ. S. 98-1712-FCD-JFM at *5 (E.D.Cal. Mar. 5, 1999). The district court also found that Unigard has standing to bring the present action, id. at 6, and that MERLO is not preempted by CERCLA, id. at 6-13. Finally, the district court abstained under the Pullman abstention doctrine[11] from deciding whether MERLO was preempted by state law. Id. at 14-15. Based on these rulings, the district court granted Lodi's motion to dismiss Unigard's federal preemption claim and dismissed without prejudice Unigard's state preemption and federal contracts clause claims. Unigard timely appeals the district court's ruling concerning only the federal preemption issue.
 
 3. The Fireman's Fund Decision
 
 26
 In a published opinion, the district court dismissed Fireman's Fund's claims against the individual defendants in their official capacities as "duplicative of the claims against the City." Fireman's Fund Ins. Co. v. City of Lodi, 41 F.Supp.2d 1100, 1106 (E.D.Cal.1999). The district court also held that the defendants sued in their individual capacities are entitled to qualified immunity. Id. at 1107. The rulings on the remaining issues — including ripeness, standing, and federal and state preemption — were identical to those rulings in the Unigard action. Id. at 1107-13. The district court found that: (1) Fireman's Fund's claims are ripe; (2) Fireman's Fund has standing to bring the instant action; and (3) MERLO is not preempted by CERCLA. Again, the district court abstained from deciding whether MERLO is preempted by HSAA based on the doctrine of Pullman abstention.
 
 
 27
 Based on these rulings, the district court denied Fireman's Fund's motion for partial summary judgment and a permanent injunction, dismissed the individual defendants and the Law Firm from the action, dismissed the federal preemption claim against Lodi, and abstained from ruling on the state preemption claim. The district court dismissed the state preemption and remaining constitutional claims without prejudice.
 
 
 28
 Fireman's Fund timely appeals the district court's rulings concerning federal and state preemption, and the district court's dismissal of the official capacity claims against the individual defendants.
 
 II.
 STANDARD OF REVIEW
 
 29
 We review de novo a district court's decision to grant or deny a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Gonzalez v. Metropolitan Transp. Auth., 174 F.3d 1016, 1018 (9th Cir.1999). In reviewing the complaint, all factual allegations "are taken as true and construed in the light most favorable to [p]laintiffs." Epstein v. Washington Energy Co., 83 F.3d 1136, 1140 (9th Cir.1996).
 
 
 30
 Similarly, we review de novo whether this case meets the requirements of the Pullman abstention doctrine. Martinez v. Newport Beach City, 125 F.3d 777, 780 (9th Cir.1997). The district court has no discretion to abstain in cases that do not meet the requirements of the abstention doctrine being invoked. Id.
 
 III.
 ANALYSIS
 
 31
 On appeal, Fireman's Fund asserts that the district court erred in abstaining from deciding whether MERLO is preempted by various state laws, and Fireman's Fund and Unigard argue that MERLO is in fact preempted by state and federal law. We find that the district court erred in abstaining from deciding whether MERLO is preempted by state law. Because the state law preemption analysis resembles the federal preemption analysis, we consider whether MERLO is preempted by federal law in conjunction with the state law preemption question. We conclude by finding that although a few sections of MERLO are preempted by state and federal law under the doctrine of conflict preemption, the majority of the Insurers' preemption arguments lack merit.
 
 
 32
 In addition, Fireman's Fund appeals the district court's decision dismissing its official capacity claims against three individual defendants. We agree with Fireman's Fund and reinstate those claims.
 
 A. ABSTENTION
 
 33
 Three factors must be present before a district court may abstain under the Pullman doctrine: "(1) the complaint must involve a `sensitive area of social policy' that is best left to the states to address; (2) `a definitive ruling on the state issues by a state court could obviate the need for [federal] constitutional adjudication by the federal court';[12] and (3) `the proper resolution of the potentially determinative state law issue is uncertain.'" Cedar Shake and Shingle Bureau v. City of Los Angeles, 997 F.2d 620, 622 (9th Cir.1993) (quoting Kollsman v. City of Los Angeles, 737 F.2d 830, 833 (9th Cir.1984)). If a court invokes Pullman abstention, it should stay the federal constitutional question "until the matter has been sent to state court for a determination of the uncertain state law issue." Erwin Chemerinsky, Federal Jurisdiction, § 12.2.1, at 737 (3d ed.1999).[13]
 
 
 34
 As to the first factor, we do not believe that "the complaint ... involve[s] a sensitive area of social policy that is best left to the states to address." Cedar Shake and Shingle Bureau, 997 F.2d at 622 (internal quotation omitted). Although the interpretation of a local ordinance that enables the City to pay for hazardous waste remediation is undoubtedly an area of "serious local concern," as the district court held, it cannot be said that states should be left to address the coordination of such remediation alone. The federal government has definitively entered the field of hazardous waste remediation by enacting CERCLA. Moreover, the text of CERCLA makes clear that Congress envisioned a partnership between various levels of government in addressing the complex and costly problems associated with hazardous waste remediation. See, e.g., 42 U.S.C. §§ 9614(a), 9652(d), 9659(h). The exact contours of such a partnership, though indeed a sensitive area of social policy, need not be resolved by states in isolation. We therefore find that the district court erred in concluding that the first Pullman abstention factor has been satisfied.
 
 
 35
 The third Pullman abstention factor is also lacking. As set forth above, this factor requires us to find that "the proper resolution of the potentially determinative state law issue is uncertain." Cedar Shake and Shingle Bureau, 997 F.2d at 622 (internal quotation and citation omitted). The fact that a state court has not ruled on the precise issue at stake in this case does not mean that the proper resolution of the state law issue is "uncertain." Wis. v. Constantineau, 400 U.S. 433, 439, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971); see also Pearl Invest. Co. v. City & County of San Francisco, 774 F.2d 1460, 1465 (9th Cir.1985) (holding that uncertainty for Pullman abstention means that a federal court cannot predict with any confidence how a state's highest court would decide an issue of state law).
 
 
 36
 We find it fairly clear that MERLO as a whole is consistent with state law, and that municipalities in California may enact local ordinances that allow them to take an active role in remediating local hazardous waste contamination. See Section III. B.2.d. infra. Even if the state court were to find, as we do infra, that a few specific provisions of MERLO are preempted, such a finding would invalidate only those specific provisions. The bulk of MERLO would remain in effect, as would our obligation to consider Fireman's Fund's federal constitutional claims. Pullman abstention is therefore inappropriate.
 
 
 37
 Because there is no discretion to abstain in cases that do not meet the requirements of the abstention doctrine being invoked, Martinez, 125 F.3d at 780, we hold that the district court erred in abstaining from ruling on Fireman's Fund's state law preemption claim. We proceed now to the merits of the federal and state preemption analysis.
 
 B. PREEMPTION
 
 38
 Fireman's Fund argues that MERLO is preempted by state-law. In addition, both Fireman's Fund and Unigard argue that MERLO is preempted by federal law.
 
 
 39
 Under the Supremacy Clause of the United States Constitution, state laws that "interfere with, or are contrary to the laws of Congress" are preempted and are therefore invalid. Gibbons v. Ogden, 22 U.S. (9 Wheat) 1, 211, 6 L.Ed. 23 (1824). "Congressional intent governs our determination of whether federal law preempts state law. If Congress so intends,'[p]re-emption ... is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." Boyes v. Shell Oil Prods. Co., 199 F.3d 1260, 1267 (11th Cir.2000) (quoting Gade v. National Solid Wastes Mgmt. Ass'n, 505 U.S. 88, 96, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992) (plurality)).
 
 
 40
 California preemption doctrine is based on Article XI, section 7 of the California Constitution, which states that "[a] county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." Cal. Const., art. XI, § 7 (emphasis added); Sherwin-Williams Co. v. City of Los Angeles, 4 Cal.4th 893, 16 Cal.Rptr.2d 215, 217, 844 P.2d 534 (1993). The California Supreme Court has held that State Law is "in conflict with" or preempts local law if the local law "duplicates, contradicts, or enters an area fully occupied by general law, either expressly or by legislative implication." Sherwin-Williams, 16 Cal.Rptr.2d at 217, 844 P.2d 534.
 
 1. Field Preemption
 
 41
 As the Insurers acknowledge, CERCLA contains three separate savings clauses to preserve the ability of states to regulate in the field of hazardous waste cleanup. First, CERCLA § 114(a) states that "[n]othing in this chapter shall be construed or interpreted as preempting any State from imposing any additional liability or requirements with respect to the release of hazardous substances within such State." 42 U.S.C. § 9614(a). Second, CERCLA § 302(d) states that "[n]othing in this chapter shall affect or modify in any way the obligations or liabilities of any person under other Federal or State law, including common law, with respect to release of hazardous substances or other pollutants or contaminants...." 42 U.S.C. § 9652(d). And third, CERCLA § 310(h) states that "[t]his chapter does not affect or otherwise impair the rights of any person under Federal, State, or common law, except with respect to the timing of review as provided in section 9613(h)," a CERCLA provision that is not at issue in the present case. 42 U.S.C. § 9659(h). Based on these provisions, this court has held that "CERCLA does not completely occupy the field of environmental regulation." ARCO Envtl. Remediation, LLC v. Dep't of Health and Envtl. Quality, 213 F.3d 1108, 1114 (9th Cir.2000).
 
 
 42
 Notwithstanding this precedent, the Insurers argue that MERLO is preempted by the combined impact of CERCLA and HSAA under the doctrine of field preemption. According to the Insurers, CERCLA and HSAA, together, occupy the field because CERCLA explicitly authorizes states, but not municipalities, to impose additional requirements regarding the cleanup of hazardous substances. The Insurers' argument is based on the premise that, by referring to states but not political subdivisions in the text of the statute, Congress intended CERCLA to leave room for supplemental state legislation but to prohibit supplemental municipal legislation.
 
 
 43
 This argument is contrary to the Supreme Court's ruling in Wisconsin Public Intervenor v. Mortier, 501 U.S. 597, 111 S.Ct. 2476, 115 L.Ed.2d 532 (1991), contrary to the language of the statute itself, and contrary to reason. In Mortier, the Supreme Court considered whether the Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA") preempted a local ordinance adopted by the city of Casey, Wisconsin. Id. at 602, 111 S.Ct. 2476. The Court began its analysis by noting that FIFRA expressly authorizes "State[s]" to regulate pesticides, but makes no reference in the savings clause to political subdivisions of states. Id. at 606-07, 111 S.Ct. 2476. The Court went on to find, however, that the term "State" is broad enough to encompass political subdivisions, and that the fact that FIFRA is silent with respect to the power of local governments "cannot suffice to establish a clear and manifest purpose to preempt local authority." Id. at 607, 111 S.Ct. 2476 (internal quotation omitted). As the Court explained:
 
 
 44
 The exclusion of political subdivisions cannot be inferred from the express authorization to the "State[s]" because political subdivisions are components of the very entity the statute empowers. Indeed, the more plausible reading of FIFRA's authorization to the States leaves the allocation of regulatory authority to the "absolute discretion" of the States themselves, including the option of leaving local regulation of pesticides in the hands of local authorities.
 
 
 45
 Id. at 608, 111 S.Ct. 2476.
 
 
 46
 We find that Mortier's reasoning regarding FIFRA is equally applicable to CERCLA. Like FIFRA, CERCLA anticipates that states will enact supplemental remedial environmental legislation. Moreover, like FIFRA, the CERCLA savings clauses refer only to "State[s]," while CERCLA specifically refers to both states and political subdivisions in other provisions. Compare 42 U.S.C. § 9614(a) (referring only to "State[s]"), with 42 U.S.C. § 9606(a) (referring to "a State or local government").
 
 
 47
 Indeed, here California has exercised its discretion to permit municipalities to regulate hazardous waste remediation in some circumstances. The California Constitution provides Lodi and other cities with broad municipal authority to address local environmental nuisances, Cal. Const., Art. XI, § 7, and the California Legislature has adopted numerous laws authorizing political subdivisions to adopt ordinances for the protection of the environment. See, e.g., Cal. Gov't Code § 38771 (West 2001) (providing cities with the authority to determine what constitutes a public nuisance); Cal. Gov't Code § 38773 (West 2001) (granting cities the authority to provide for the abatement of public nuisances).
 
 
 48
 In addition, the text of HSAA contemplates the ability of cities to adopt parallel municipal environmental ordinances. HSAA defines an authorized release into the environment as including a release "which is authorized by statute, ordinance, or rule of any state, regional, or local agency or government." Cal. H & S Code § 25326 (emphasis added). HSAA's savings clause provides that with certain exceptions not applicable here, HSAA does not "affect or modify in any way the obligations or liabilities of any person under any other provision of state or federal laws." Cal. H & S Code § 25366 (emphasis added). Significantly, the phrase "state law" is used in § 25326 to include municipalities. See Cal. H & S Code § 25326 ("A `release authorized or permitted pursuant to state law' means any release into the environment which is authorized by statute, ordinance, regulation, or rule of any state, regional, or local agency or government ...").
 
 
 49
 Finally, the text of CERCLA indicates that Congress anticipated remedial actions undertaken by local governments independent of CERCLA's own provisions:
 
 
 50
 In addition to any other action taken by a State or local government, when the President determines that there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from a facility, he may require the Attorney General of the United States to secure such relief as may be necessary to abate such danger or threat [proceeding under the provisions of CERCLA]....
 
 
 51
 42 U.S.C. § 9606(a) (emphasis added).
 
 
 52
 In the absence of a strong indication to the contrary, we adhere to the presumption that Congress did not intend CERCLA to "den[y] local communities throughout the Nation significant powers of self-protection." Mortier, 501 U.S. at 621, 111 S.Ct. 2476 (Scalia, J., concurring); see also Western Oil and Gas Assoc. v. Monterey Bay Unified Air Pollution Control Dist., 49 Cal.3d 408, 261 Cal.Rptr. 384 393-94, 777 P.2d 157 (1989) ("In view of the long tradition of local regulation and the legislatively imposed duty [on local governments] to preserve and protect the public health, preemption may not be lightly found."). Accordingly, we hold that CERCLA permits both states and their political subdivisions to enact hazardous waste regulations and pursue additional remedies, as long as those remedies do not conflict or interfere with "the accomplishment and execution of [CERCLA's] full purpose and objective...." Indus. Truck Ass'n v. Henry, 125 F.3d 1305, 1309 (9th Cir.1997).
 
 2. Conflict Preemption
 
 53
 The Insurers next assert that CERCLA and HSAA preempt seven specific portions of MERLO under the doctrine of conflict preemption. We will find federal conflict preemption where "compliance with both the federal and state regulations is a physical impossibility," or when the state law stands as "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." California Fed. Sav. and Loan Ass'n v. Guerra, 479 U.S. 272, 281, 107 S.Ct. 683, 93 L.Ed.2d 613 (1987). Similarly, we will find conflict preemption under California law when a local ordinance prohibits conduct that is expressly authorized by state statute or authorizes conduct that is expressly prohibited by state general law. Sports Comm. Dist. v. County of San Bernardino, 113 Cal.App.3d 155, 159, 169 Cal. Rptr. 652 (1980).
 
 
 54
 The Insurers challenge the following seven sections of MERLO as preempted: (a) the MERLO section permitting Lodi to be compensated for damage to its natural resources; (b) MERLO's general liability scheme, including the sections of MERLO that provide for the joint and several liability of PRPs, and the sections setting forth the contribution rights of PRPs; (c) MERLO's burden of proof for establishing a defense to liability; (d) the MERLO sections addressing the cleanup standard set forth in the NCP; (e) the MERLO sections defining "abatement action costs" to permit Lodi to recover attorney's fees and interest; (f) the MERLO section authorizing Lodi to gather certain information from PRPs and their insurers; and (g) the MERLO section permitting Lodi to bring direct actions against insurers of PRPs.
 
 
 55
 (a) Natural Resource Damages
 
 
 56
 MERLO states that PRPs shall be liable for "[d]amages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from the environmental nuisance." MERLO § 8.24.040(A)(9)(c) (emphasis added). The Insurers contend that this provision is preempted by state and federal law because "under CERCLA and ... HSAA, a State must designate a city as its authorized representative before a city may seek natural resource damages." According to the Insurers, because Lodi has not been designated the "authorized representative" of the State of California, it cannot recover for damages to its natural resources. We disagree.
 
 
 57
 CERCLA provides states, federal agencies, and Indian Tribes with a federal cause of action to sue for damages to natural resources that they hold in trust for the public. See 42 U.S.C. §§ 9607(a)(4)(C), (f)(1). Specifically, CERCLA states that:
 
 
 58
 In the case of an injury to, destruction of, or loss of natural resources under [107(1)(4)(C)] liability shall be to the United States Government and to any State for natural resources within the State or belonging to, managed by, controlled by or appertaining to such State.... The President, or the authorized representative of any State, shall act on behalf of the public as trustee of such natural resources to recover for such damages.
 
 
 59
 42 U.S.C. § 9607(f)(1). Similarly, under HSAA, the Governor of California or an "authorized representative" of the State may recover natural resources damages. Cal. H & S Code § 25352(c).
 
 
 60
 It is unnecessary for us to determine whether a municipality may recover under CERCLA for damage to its natural resources in the absence of being designated the authorized representative of a state.[14] Lodi does not assert that MERLO permits the City to sue for damages to its natural resources under CERCLA or HSAA. Rather, Lodi asserts that because "neither CERCLA nor ... HSAA purport to abrogate other causes of action, including common law actions, for damage to natural resources, including natural resources held in trust by ... municipalities," Lodi remains free to enact local ordinances such as MERLO that permit the City to recover for damage to such resources. We agree.
 
 
 61
 Notwithstanding any authority under CERCLA or HSAA that Lodi may acquire by delegation, Lodi retains its independent authority to protect its proprietary interest in natural resources held in trust by the City. We have held that although municipalities may not "sue as parens patriae [to protect their natural resources] because their power is derivative [of the state and] not sovereign," municipalities may "`sue to vindicate such of their own proprietary interests as might be congruent with the interests of their inhabitants.'" Colorado River Indian Tribes v. Town of Parker, 776 F.2d 846, 848-49 (9th Cir.1985) (quoting In re Multidistrict Vehicle Air Pollution M.D.L. No. 31, 481 F.2d 122, 131 (9th Cir.1973))(explaining that the concept of parens patriae is derived from authority invested in the English Sovereign to protect the interest of his subjects and has devolved in this country only to the states and federal government, whereas municipalities, which lack sovereignty, do retain authority to vindicate such of their own proprietary interests as are congruent with the interests of their inhabitants) (emphasis added). Consistent with this holding, we find that Lodi retains its authority under state law to protect its proprietary interest in its natural resources from damage. Moreover, to the extent that natural resources owned or held in trust by Lodi are damaged by environmental contamination, we find that nothing in CERCLA or HSAA prevents the City from suing under MERLO to recover for damage to such resources.
 
 
 62
 Likewise, allowing the City to do so does not conflict with either state or federal law. A finding of liability for natural resource damage under MERLO would not make compliance with CERCLA or HSAA impossible. See Indus. Truck Ass'n, 125 F.3d at 1309 (explaining that court will find federal conflict preemption when "it is impossible to comply with both state and federal requirements"). Nor would it "stand as an obstacle to" accomplishing and executing the goals of CERCLA and HSAA. Id. (stating that courts will find federal conflict preemption when "state law stands as an obstacle to the accomplishment and execution of the full purpose and objectives of Congress").
 
 
 63
 We therefore find that MERLO § 8.24.040(A)(9)(c) is not preempted by state or federal law.
 
 
 64
 (b) MERLO's Liability Scheme
 
 
 65
 The Insurers next allege that the provisions of MERLO providing for recovery of cleanup costs from PRPs conflict with and are therefore preempted by CERCLA and HSAA. MERLO allows the City, once it has incurred cleanup costs, to impose joint and several liability on PRPs for the entire amount of its costs. See MERLO § 8.24.040. At the same time, MERLO fails to provide a mechanism whereby PRPs may impose on the City its fair share of costs incurred (whatever that fair share might be). Under the facts of this case, we agree that portions of this liability scheme are preempted if the district court finds that Lodi is a PRP.
 
 
 66
 Section 107 of CERCLA permits the government or a private party who has incurred response costs to bring suit against a PRP to recover those costs. See 42 U.S.C. § 9607. Applying federal common law principles, we have interpreted Section 107 as imposing joint and several liability on PRPs whenever the harm caused to a site is indivisible. Atchison, Topeka & Santa Fe Ry. Co. v. Brown & Bryant, Inc., 159 F.3d 358, 362 (9th Cir. 1998). Importantly, because liability is joint and several, a defendant PRP in a cost-recovery action under Section 107 may be held fully liable for the entire clean-up costs at a site, despite the fact that the defendant PRP was in fact responsible for only a fraction of the contamination.
 
 
 67
 Moreover, as originally enacted, CERCLA did not provide PRPs with an express cause of action for contribution. See Centerior Serv. Co. v. Acme Scrap Iron & Metal Corp., 153 F.3d 344, 348 (6th Cir. 1998). Without a claim for contribution, any individual PRP could be singled out as a defendant in a Section 107 cost-recovery action and required to reimburse the Section 107 plaintiff for response costs far in excess of the defendant PRP's pro rata share. Because such a result appeared inequitable, many courts recognized an implicit right to contribution under Section 107, where a PRP was subject to joint and several liability and incurred response costs in excess of its fair share. See, e.g., Mardan Corp. v. C.G.C. Music Ltd., 804 F.2d 1454, 1457 & n. 3 (9th Cir.1986).
 
 
 68
 In 1986, Congress amended CERCLA by passing the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), 42 U.S.C. §§ 9601-9675. Among other additions, SARA added CERCLA § 113(f), which explicitly recognizes a claim for contribution. Pinal Creek Group v. Newmont Mining Corp., 118 F.3d 1298, 1300 (9th Cir.1997). "A PRP's contribution liability [under CERCLA § 113(f)] correspond[s] to that party's equitable share of the total liability...." Id. at 1301. Thus, CERCLA § 107 and CERCLA § 113 provide different remedies: a defendant in a § 107 cost-recovery action may be jointly and severally liable for the total response cost incurred to cleanup a site, whereas a defendant in a § 113(f) contribution action is liable only for his or her pro rata share of the total response costs incurred to cleanup a site.
 
 
 69
 Like CERCLA, HSAA explicitly authorizes any PRP that has incurred response costs to seek contribution from any other PRP. Cal. H & S Code § 25363(e). However, "unlike liability under CERCLA, liability under HSAA is not truly joint and several. Any person found liable for costs under [] HSAA who establishes by a preponderance of the evidence that only a portion of those costs or expenditures are attributable to that person's actions will be required to pay only for that portion." Bancroft-Whitney, California Civil Practice, Environmental Litigation, § 3:85 (1993); see also Cal. H & S Code § 25363(a). Liability under HSAA is therefore apportioned according to fault.
 
 
 70
 The Insurers first argue that MERLO conflicts with CERCLA and HSAA because "CERCLA and HSAA allow any PRP that has incurred response costs to seek contribution from any other PRP," whereas under MERLO, Lodi cannot be sued for contribution.
 
 
 71
 This conflict preemption argument is rooted in the Insurers' assumption that Lodi is a PRP. To date, however, Lodi has not been administratively adjudged a PRP by either the federal EPA or California's DTSC. Nor has a court adjudged Lodi a PRP. While we decline to decide whether Lodi is a PRP on the record before us, we note that it is doubtful whether Lodi may be considered a PRP merely as a result of operating its municipal sewer system. See Lincoln Prop., Ltd. v. Higgins, 823 F.Supp. 1528, 1539-44 (E.D.Cal.1992) (holding that a municipal operator of a sewer system that leaked hazardous waste could rely on a third-party defense to avoid liability under CERCLA). But see Westfarm Assocs. v. Wash. Suburban Sanitary Comm'n, 66 F.3d 669, 675-80 (4th Cir.1995) (holding that a municipal operator of a sewer system is liable for the acts of a third party that discharges hazardous waste into the system). See also Robert M. Frye, Municipal Sewer Authority Liability Under CERCLA: Should Taxpayers Be Liable For Superfund Cleanup Costs?, 14 Stan. Envtl. L.J. 61 (1995) (criticizing the Westfarm decision and arguing that municipalities should not bear CERCLA liability for operating sewer systems because some leakage from sewers is unavoidable and the parties dumping chemicals into the sewer, not the operator of the sewer, is the responsible party). We remand to the district court the question of whether Lodi is a PRP.
 
 
 72
 If the district court finds that Lodi is a PRP, MERLO is preempted to the extent that it protects Lodi from contribution claims by other PRP's.[15] CERCLA permits a PRP who incurs response costs to bring suit to recover those costs from any other PRP. Thus, in theory, Fireman's Fund's or Unigard's insured could remediate the Lodi site and then sue the City pursuant to CERCLA § 113(f) or HSAA § 25356(e) for contribution in the amount of Lodi's fair share of the costs. If Lodi is indeed a PRP, it cannot simply legislate away this potential contribution liability under state and federal law. For these reasons, we find that MERLO is preempted to the extent that it legislatively insulates Lodi from contribution liability under state and federal law.[16]
 
 
 73
 Next, the Insurers allege that MERLO conflicts with CERCLA because under MERLO § 8.24.040, Lodi may impose joint and several liability for the entire clean-up cost onto any one PRP, whereas CERCLA does not permit "a PRP such as Lodi to impose joint and several liability on other PRPs."
 
 
 74
 Our circuit has held that a PRP may not bring a CERCLA § 107 cost recovery action, and instead may bring only a claim for contribution under CERCLA § 113(f). Pinal Creek, 118 F.3d at 1301. This means that a PRP "does not have a claim for the recovery of the totality of its cleanup costs against other PRPs, and a PRP cannot assert a claim against other PRPs for joint and several liability." Id. at 1306. In support of our decision in Pinal Creek, we noted that allowing a party responsible for part of the contamination to impose joint and several liability on other PRPs would result in unfair cost shifting and "guarantee[] inefficiency, potential duplication, and prolongation of the litigation process in a CERCLA case." Id. at 1303 (quoting T H Agric. & Nutrition Co. v. Aceto Chem. Co., 884 F.Supp. 357, 361 (E.D.Cal.1995)). We have not recognized any exception to Pinal Creek for municipal PRPs and we decline to do so now.
 
 
 75
 Thus, if the district court determines that Lodi is a PRP, Lodi may not escape its share of responsibility by imposing all the costs of cleanup on others. Allowing it to do so would interfere with CERCLA's PRP cost allocation scheme, and would implicate the same policy concerns relied upon by this court in Pinal Creek in rejecting a § 107 cost recovery action for PRPs. Id. For these reasons, we find that MERLO is preempted to the extent that it legislatively insulates Lodi from bearing its share of responsibility by imposing joint and several liability on other PRPs.
 
 
 76
 On the other hand, if the district court finds that Lodi is not a PRP, MERLO's liability scheme does not come into conflict with CERCLA because under CERCLA, a non-PRP may impose joint and several liability on whatever PRPs it can locate. Therefore, if Lodi proves not to be a PRP it may invoke MERLO's liability scheme without coming into conflict with CERCLA.
 
 
 77
 (c) MERLO's Burden of Proof for PRPs for Establishing a Defense to Liability
 
 
 78
 MERLO requires a defendant PRP seeking to apportion its liability to demonstrate by clear and convincing evidence that the harm is divisible, see MERLO § 8.24.040(E), whereas CERCLA and HSAA require a PRP to demonstrate only by a preponderance of the evidence that the harm is divisible. See 42 U.S.C. § 9607(b) and Cal. H & S Code § 25363(a). In other words, in order to avoid liability for the entire cleanup, under MERLO a defendant must prove by clear and convincing evidence its proportional responsibility for the hazardous wastes being cleaned.
 
 
 79
 For the same reasons that Lodi cannot legislatively insulate itself from contribution liability as a PRP under CERCLA, it cannot foist its share of liability onto others by imposing on fellow PRPs a higher burden of proof for apportionment.
 
 
 80
 Even if the district court finds that Lodi is not a PRP, this particular provision of MERLO conflicts with CERCLA and is preempted because it stands as "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." California Fed. Sav., 479 U.S. at 281, 107 S.Ct. 683. A fundamental purpose and objective of CERCLA is to encourage the timely cleanup of hazardous waste sites. Stanton Road Assoc. v. Lohrey Enter., 984 F.2d 1015, 1019 (9th Cir.1993). One of the greatest obstacles to the cleanup of properties that are, or are perceived to be, contaminated by hazardous substances is the risk of uncertain or overly strict regulatory demands. See generally U.S. Envtl. Prot. Agency, Handbook Of Tools For Managing Federal Superfund Liability Risks at Brownfields And Other Sites, EPA Publication Number EPA 330-B-98-001 (Nov.1998); see also U.S. Conference of Mayors, Recycling America's Land, A National Report on Brownfields Redevelopment — Volume 3 7 (2000) (tracing inability to clean up many contaminated sites to overly aggressive liability schemes); Nat'l Governors Ass'n, New Mission for Brownfields 13 (2000) (finding "specter of liability" as impediment to investigating and remediating soil and groundwater contamination). Congress, too, has recognized the widespread belief that "fear of prolonged entanglement in[onerous] liability schemes" has become an impediment to cleanup of contamination. S.Rep.No. 107-2, at 2 (2001) (accompanying the Brownfields Revitalization And Environmental Restoration Act of 2001 (codified in scattered sections of 42 U.S.C.)).
 
 
 81
 Potential purchasers of abandoned or underutilized contaminated properties are often deterred from purchasing and cleaning up these properties by exposure to unbounded and uncertain liability.[17] See generally California Center For Land Recycling, Strategies For Promoting Brownfield Reuse In California (1998); see also S.Rep.No. 107-2, at 3. Many initiatives have been instituted by California and the federal government to "expedite the cleanup of these `Brownfields', and reduce the cost and burden of returning such properties to beneficial use." Bancroft-Whitney § 3.80. Cleanups conducted pursuant to federal and California law have come to achieve some level of predictability, thus allowing for a reasonable estimate of exposure to liability and of the costs involved in taking on a cleanup. See, e.g., Robert P. Dalquist, Making Sense Of Supelocation Decisions: The Rough Justice Of Negotiated And Litigated Allocations, 31 Envtl. L. Rep. 11098, 11098-99 (2001). Such certainty, to the extent that it is available, greatly encourages prospective purchasers to rehabilitate contaminated property and put it back into productive use.[18] See, e.g., S.Rep.No. 107-2, at 4.
 
 
 82
 Moreover, environmental insurance, which was driven from the market by CERCLA's joint and several and retroactive provisions, has recently become available again because evolving case law and more recent state and federal legislation have restored a degree of certainty to exposure to environmental risk. See, e.g., California Center For Land Recycling, Creating Vibrant Communities: Redeveloping California's Brownfields § 5 (2002); see also, Marialuisa S. Gallozzi & Alice V. Stevens, Introduction To Environmental Risk Policies, SG006 ALI-ABA 549 (2002). The availability of environmental insurance may allow early settlement, even among large groups of PRP's, thus allowing energy and resources to be directed at site cleanup rather than protracted litigation. Creating Vibrant Communities § 5.
 
 
 83
 To allow literally thousands of different local governments to impose their own liability schemes (such as Lodi's) that make it more difficult to apportion liability than under CERCLA would foster uncertainty and discourage site cleanup. Indeed, Lodi's requirement that a PRP prove by clear and convincing evidence that it caused a divisible portion of the harm is greater than the burden of proof required by CERCLA or HSAA, greater than that normally required in a civil case (preponderance of the evidence), and seems both inefficient and inequitable. If we were to approve Lodi's standard of proof, other California cities could follow, adopting hundreds of different liability schemes all more onerous than CERCLA. The risk of overly strict and uncertain liability would thereby be compounded, thwarting CERCLA's goals.
 
 
 84
 On the other hand, municipal liability schemes equal to or less onerous than that imposed by CERCLA do not foster uncertainty or discourage cleanup but could, in many instances, make rehabilitation of contaminated property more feasible, thus furthering the objective of Congress.
 
 
 85
 We hold therefore that MERLO's requirement that a defendant PRP seeking to apportion its liability must demonstrate by clear and convincing evidence that the harm is divisible is in conflict with CERCLA and is preempted. We reach this conclusion regardless of what determination the district court ultimately makes on the question of whether Lodi is, or is not, a PRP.
 
 
 86
 (d) The National Contingency Plan ("NCP") Standard
 
 
 87
 The Insurers next argue that the portions of MERLO dealing with the cleanup standard set forth in the National Contingency Plan ("NCP") conflict with CERCLA § 107(a)(4)(B) and HSAA § 25356, both of which address the NCP. See MERLO §§ 8.24.030-040.
 
 
 88
 Under CERCLA, the cleanup of listed hazardous waste sites must be consistent with the NCP, which is a plan promulgated by the EPA that "specifies the roles" of the federal, state, and local governments "in responding to hazardous waste sites, and establishes the procedures for making cleanup decisions." United States v. City of Denver, 100 F.3d 1509, 1511 (10th Cir. 1996). Only costs incurred in accordance with the NCP may be recovered under CERCLA. The burden of establishing that the cleanup process is consistent with the NCP depends on whether the plaintiff in a CERCLA action is the government or "any other person": "While the United States government, or a [S]tate or Indian tribe, can obtain `all costs of removal or remedial action ... not inconsistent with the [NCP],' any other person can obtain `other necessary costs of response ... consistent with the [NCP].'" Wash. State Dept. of Transp. v. Wash. Natural Gas Co., 59 F.3d 793, 799 (9th Cir.1995) (quoting 42 U.S.C. § 9607(a)(2), (a)(4)(A)-(B)) (emphasis added). Thus, where "the United States government, a [S]tate, or an Indian tribe is seeking recovery of response costs, consistency with the NCP is presumed," and the burden is on the defendant to rebut the presumption of consistency by establishing that the plaintiff's response action was arbitrary and capricious. Id. (emphasis added). "In contrast, any `other person' seeking response costs under [CERCLA] must prove that its actions are consistent with the NCP." Id. (emphasis added).
 
 
 89
 HSAA incorporates the NCP standard by reference. Under HSAA, "[a]ny response action taken or approved pursuant to this chapter shall be based upon, and be no less stringent than ... [t]he requirements established under federal regulation pursuant to [the NCP]." Cal. H & S Code § 25356.1.5(a)(1).
 
 
 90
 The Insurers argue that the provisions of MERLO addressing the NCP are preempted for two reasons. First, the Insurers argue that MERLO conflicts with CERCLA because it permits Lodi to recover from PRPs any "necessary costs of response incurred by the city" that are "not inconsistent with the requirements of this chapter." MERLO § 8.24.040(A)(9)(b) (emphasis added). Thus, MERLO provides for the City a presumption of consistency with cleanup standards. The Insurers allege that even though this provision of MERLO does not specifically reference the NCP,[19] it was crafted to provide Lodi "the identical presumption of consistency with the NCP that CERCLA ... reserve[s] for the United States, States, and Indian Tribes."
 
 
 91
 We have previously distinguished between local governmental units, such as municipalities, and "States" as defined by CERCLA, 42 U.S.C. § 9607(a)(4)(A). See Wash. State Dept. of Transp., 59 F.3d at 800-01; United States ex rel. Norton Sound Health Corp. v. Bering Strait School Dist., 138 F.3d 1281, 1284 (9th Cir. 1998). Whether a municipality standing on its own is entitled to a presumption of consistency with the NCP in the context of cost recovery conducted pursuant to CERCLA is undecided in this circuit.[20] We need not decide this issue today. In this case the Cooperative Agreement between Lodi and the DTSC prominently declares in several places that the cleanup of the Lodi Groundwater Site shall be conducted in a manner "not inconsistent with the NCP." In the Cooperative Agreement, DTSC has assumed an oversight role[21] and designated the City of Lodi as "the lead enforcement entity." DTSC and Lodi's "joint responsibilities" under the Agreement include ensuring "cost-effective performance of the Work." In essence, the Cooperative Agreement makes the DTSC responsible for ensuring an efficient, reasonable, and cost-effective cleanup. Lodi, acting with DTSC oversight, is therefore entitled to the presumption of consistency under CERCLA afforded to state agencies such as DTSC. See Wash. State Dept. of Transp., 59 F.3d at 800-01 (holding that a state agency is entitled to presumption of consistency under CERCLA § 9607(a)(4)(A)).
 
 
 92
 Contrary to the Insurers' contentions, this presumption of consistency would not allow Lodi to escape any responsibility it should rightly bear if the district court finds that Lodi is a PRP. Rather, it encourages a more expeditious cleanup by affording Lodi, "acting in close cooperation, coordination and communication with DTSC," the presumption that the cost of selected cleanup mechanisms are recoverable from other PRPs to the extent that other PRPs are adjudged to be responsible parties. This arrangement should direct energy and resources toward cleaning up the site, rather than toward paying lawyers to build a case for the recoverability of costs. We hold, therefore, that even if Lodi proves to be a PRP, it is entitled to the presumption of consistency with the NCP afforded by the Cooperative Agreement with respect to matters addressed in the Agreement.
 
 
 93
 Next, the Insurers argue that MERLO is preempted to the extent that it permits Lodi to order remediation that is either more or less stringent than the NCP. Specifically, under MERLO Lodi may order additional or more stringent requirements than those that would or might apply under the NCP. Similarly, MERLO § 8.24.030(A)(6) states that the City "may order less stringent requirements" for abatement than those that would or might apply under the NCP. See MERLO § 8.24.030(A)(5) (emphasis added). Finally, MERLO states that "at any site within the city which is [a listed site under HSAA], the enforcing officer must, at a minimum, comply with [HSAA]." MERLO § 8.24.030(A)(7).
 
 
 94
 To the extent that MERLO § 8.24.030(A)(5) permits Lodi to order abatement that is more stringent than the NCP, we find that it is preempted for the same reasons that MERLO's burden of proof is preempted.
 
 
 95
 As to the claim that MERLO allows abatement less stringent than the NCP, MERLO in fact does not permit Lodi to order abatement less stringent than the NCP with respect to the Lodi Groundwater Site. DTSC listed the Lodi Groundwater Site beginning in fiscal year 1993-94. MERLO requires that listed sites comply with HSAA, which in turn requires that response actions be based upon and be no less stringent than the NCP.[22] Therefore, as it applies to the Lodi Groundwater Site, MERLO itself requires that response actions be no less stringent than the NCP, hence MERLO does not come into conflict with CERCLA or HSAA on this point.[23]
 
 
 96
 With respect to application of MERLO beyond the Lodi Groundwater Site, we see no reason why California cities may not enact municipal environmental response ordinances keying cleanup to standards other than the NCP. Cleanups conducted pursuant to CERCLA and HSAA require use of the NCP. However, we have held that CERCLA and HSAA do not preempt the field of hazardous waste cleanup. So long as a local ordinance does not come into conflict with CERCLA or HSAA, as we have explained MERLO would in some instances, a city may borrow or adapt the NCP as it sees fit — or use some other procedure for making cleanup decisions. An agreement with or authorization from the state is not a prerequisite to local environmental legislation.[24] Local environmental legislation may be particularly useful to California cities in dealing with smaller, marginally contaminated sites that do not attract state or federal involvement, and for which the extensive procedural requirements of the NCP may unnecessarily prolong cleanup and raise its cost. A city may compel a recalcitrant landowner to clean up such a site using standards that make sense under the circumstances.[25] We hold, therefore, that MERLO's provisions dealing with cleanup procedures are preempted by CERCLA only to the extent that they permit Lodi to order use of procedures more stringent than the NCP.[26]
 
 
 97
 (e) Recovery of Attorney's Fees and Other "Abatement Action Costs"
 
 
 98
 Under MERLO, Lodi may recover from any PRP "[a]ll abatement action costs incurred by the city to undertake, or cause or compel any responsible party to undertake, any abatement action in compliance with the requirements of this chapter...." MERLO § 8.24.040(A)(9)(a) (emphasis added). MERLO defines the phrase "abatement action costs" to include "any and all legal, technical or administrative fees and costs and interest and other costs of financing incurred by the [C]ity in performing or preparing to perform an abatement action." MERLO § 8.24.010(2). Thus, MERLO permits the City to recover any attorney's fees it incurs in the course of its efforts to cleanup the PCE contamination of its soil and groundwater.
 
 
 99
 In Key Tronic Corp. v. United States, 511 U.S. 809, 114 S.Ct. 1960, 128 L.Ed.2d 797 (1994), the Supreme Court held that CERCLA § 107(a)(4) does not permit a "private party" to recover her attorney's fees. 511 U.S. at 817-19, 114 S.Ct. 1960 (emphasis added). However, in United States v. Chapman, 146 F.3d 1166 (9th Cir.1998), we held that CERCLA § 107(a)(4) permits the United States Government or a State or an Indian tribe to recover all "reasonable attorney fees" "attributable to the litigation as a part of its response costs" if it is the "prevailing party." Chapman, 146 F.3d at 1175-76 (citing Key Tronic, 511 U.S. at 813, 819, 114 S.Ct. 1960) (emphasis added).
 
 
 100
 We need not decide if a city is the "State" for purposes of recovering its attorney fees under CERCLA, because, in any case, a city that is also a PRP should not be able to avail itself of this advantage. If the district court finds that Lodi is indeed a PRP, it may not legislate for itself a litigation advantage by granting itself the right to collect attorney's fees. If, on the other hand, Lodi proves not to be a PRP, we see no reason why Lodi may not provide for recovery of attorney's fees for itself under its municipal liability scheme. Of course, the amount and nature of attorney's fees recoverable is always subject to the reasonableness standard as applied in the discretion of the district court.
 
 
 101
 We have held above that Lodi is entitled to the presumption of consistency bestowed on States by the phrase "not inconsistent with the national contingency plan" contained in CERCLA, 42 U.S.C. § 9607(a)(4)(A), by virtue of the Cooperative Agreement with the DTSC. A similar result, however, is not called for with respect to attorney's fees. The ability of states to recover attorney's fees under CERCLA flows from language providing that responsible parties shall be liable to states for "all costs of removal or remedial action." 42 U.S.C. § 9607(a)(4)(A). Attorney's fees recoverable by states are included in the definition of "all costs." Chapman, 146 F.3d at 1175. Non-State litigants are, on the other hand, confined to recovery of "necessary costs," which do not include attorney's fees. 42 U.S.C. § 9607(a)(4)(B). Under the peculiar facts of this case, it does not follow from the fact that Lodi is entitled to the presumption of consistency, that it is also entitled to recover "all costs."
 
 
 102
 Lodi has expended significant attorney's fees in an attempt to escape liability through the enactment and defense of its municipal ordinance. These efforts, so far as we can tell, have not advanced the cleanup of the Lodi Site. Litigation costs may indeed be a part of recovering funds that are needed to advance the cleanup. However, the ability to recover litigation-related attorney's fees does not necessarily advance the pace of cleanup because it may encourage ambitious litigation. We do not interpret the Cooperative Agreement to allow Lodi to recover its attorney's fees, nor do we necessarily believe that it could bestow on Lodi the right to recover all of its attorney's fees under the circumstances of this case.
 
 
 103
 Lodi also seeks to recover costs related to a financing scheme upon which it has embarked in order to avoid municipal finance mechanisms that would make Lodi's ratepayers responsible (at least initially) for principal and interest costs. The Insurers assert that Lodi is trying to pass on, as costs of financing the cleanup, interest costs of 25 to 30 percent. We decline to pass judgment on these costs on the record before us, and leave it to the district court to determine if these costs are recoverable under the standard of "necessary costs of response" if Lodi should prove to be a PRP. If Lodi should prove not to be a PRP, we leave it to the district court to determine, under the standards the district court determines to be appropriate, whether these costs are recoverable.
 
 
 104
 (f) Information Gathering Authority
 
 
 105
 The Insurers next argue that MERLO's information gathering provision conflicts with both CERCLA and HSAA. Section 8.24.050 authorizes Lodi to compel the production of any documents, information, and testimony:
 
 
 106
 ... for the purposes of investigating the nature or source of ... an environmental nuisance, or for the purposes of determining the need for abatement actions, choosing or taking an abatement action under this chapter, or for the purposes of determining the nature and extent of the assets and financial resources that are or may be available to (or available to provide indemnity or similar benefits to) any potentially responsible parties to undertake abatement actions which are or may be required pursuant to this chapter or to reimburse the comprehensive municipal environmental response fund for any abatement action costs incurred or to be incurred by the city pursuant to this chapter.
 
 
 107
 MERLO § 8.24.050(A). The Insurers assert that by this section, Lodi has improperly "arrogated to itself" information-gathering powers that only the EPA can provide under CERCLA § 104(e), and only DTSC can provide under HSAA § 25358.1(a).
 
 
 108
 Notwithstanding any authority that Lodi may acquire by delegation, Lodi has independent authority to promulgate information-gathering legislation pursuant to its traditional police powers. These powers include the City's authority to gather the information reasonably necessary to discharge its duty to protect the public health and welfare from public nuisances. See Cal. Gov't Code § 38773.5 (a municipality's legislative body may by Ordinance establish a procedure for the abatement of a nuisance). In addition, California Government Code § 37104 specifically authorizes city councils to issue legislative subpoenas. Lodi's authority to issue legislative subpoenas under MERLO and pursuant to California Government Code § 37104 was recently reaffirmed by the California Supreme Court. See Conn. Indem. Co. v. Super. Ct., 23 Cal.4th 807, 98 Cal.Rptr.2d 221, 3 P.3d 868 (2000).
 
 
 109
 Moreover, Lodi's decision to exercise its independent information-gathering authority by enacting MERLO does not conflict with either state or federal law. Compliance with an information-gathering request under MERLO would not make compliance with such a request under CERCLA or HSAA impossible. See Indus. Truck Ass'n, 125 F.3d at 1309 (explaining that court will find federal conflict preemption when "it is impossible to comply with both state and federal requirements"). Nor would it "stand as an obstacle to" accomplishing and executing the goals of CERCLA and HSAA. Id. (stating that courts will find federal conflict preemption when "state law stands as an obstacle to the accomplishment and execution of the full purpose and objectives of Congress"). Finally, permitting Lodi to issue legislative subpoenas does not prohibit conduct expressly authorized by state statute or authorize conduct expressly prohibited by state law. See Sports Comm. Dist., 113 Cal.App.3d at 159, 169 Cal.Rptr. 652.
 
 
 110
 For these reasons, we find that MERLO's information-gathering provisions are not preempted by either CERCLA or HSAA.
 
 
 111
 (g) Direct Actions Against Insurers
 
 
 112
 Under MERLO § 8.24.090(B)(1), Lodi may initiate a direct action against a PRP's insurer before the City has obtained a final order or judgment against the insured PRP. The Insurers allege that this portion of MERLO is preempted because it conflicts with CERCLA § 108(c) and California Insurance Code § 11580. Because we find that MERLO § 8.24.090(B)(1) conflicts with California insurance law and is therefore preempted on this basis, we need not consider whether it also conflicts with CERCLA.
 
 
 113
 California Insurance Code § 11580 states that every liability insurance policy issued in California must include "[a] provision that whenever judgment is secured against the insured ... in an action based upon bodily injury, death, or property damage, then an action may be brought against the insurer on the policy and subject to its terms and limitations, by such judgment creditor to recover on the judgment." Cal. Ins.Code § 11580(b)(2) (West 2001) (emphasis added). Fireman's Fund asserts that this statute "forbids direct actions against an insurer absent a final judgment against the insured." Fireman's Fund further asserts that because MERLO § 8.24.090(B)(1) authorizes direct actions against the insurers of PRPs prior to obtaining a final judgment against the insured, but § 11580 forbids such actions, MERLO § 8.24.090(B)(1) conflicts with and is therefore preempted by California law. Sports Comm. Dist., 113 Cal.App.3d at 159, 169 Cal.Rptr. 652 (stating that conflict preemption under California law includes situations in which a local statute authorizes conduct prohibited by state law).
 
 
 114
 We begin our conflict preemption analysis with the plain language of the statute. See Moyer v. Workmen's Compl. Appeals Bd., 10 Cal.3d 222, 230, 110 Cal.Rptr. 144, 514 P.2d 1224 (1973). Contrary to Fireman's Fund's contention, on its face § 11580 neither prohibits direct actions nor purports to set forth the only circumstances under which one can initiate a direct action against an insurer. It simply allows direct actions after the third-party claimant has obtained a final judgment against the insured.
 
 
 115
 Two California Court of Appeals cases support the conclusion that § 11580 does not set forth the exclusive set of circumstances under which one may initiate a direct action against an insurer. See Roberts v. Home Ins. Indem. Co., 48 Cal. App.3d 313, 317-18, 121 Cal.Rptr. 862 (1975) ("[S]ection 11580 ... is silent as to a direct action against the insurer before judgment is obtained against the insured. That silence does not imply a legislative policy against allowing a claimant to pursue any rights which may have been created by contract or by another state's direction action statute."); Turner v. Evers, 107 Cal.Rptr. 390, 31 Cal.App.3d Supp. 11, 22 (1973) ("[S]ection 11580, subdivision (b), is a statement of the minimum provisions that must be included in all liability insurance policies issued in this state.").
 
 
 116
 However, there is greater authority to suggest that § 11580 sets forth the exclusive set of circumstances under which a third-party claimant may directly sue another policyholder's liability insurer. See McKee v. Nat'l Union Fire Ins. Co., 15 Cal.App.4th 282, 286-87, 19 Cal.Rptr.2d 286 (1993); Nationwide Ins. Co. v. Super. Court, 128 Cal.App.3d 711, 180 Cal.Rptr. 464, 466 (1982) (noting "the general rule of indemnity law that `[w]here the terms of the indemnity contract, or law of the state, require a judgment against the ... [indemnitee] before direct action against the insurer, no liability accrues as an enforceable claim against the insurer until recovery of a final judgment against [the indemnitee].'"); Zahn v. Canadian Indem. Co., 57 Cal.App.3d 509, 129 Cal.Rptr. 286, 288 (1976) ("It is fundamental that generally speaking the injured party may not directly sue an insurer of the alleged tortfeasor."); see also Tashire v. State Farm Fire & Cas. Co., 363 F.2d 7, 10 (9th Cir.1966), rev'd on other grounds, 386 U.S. 523, 87 S.Ct. 1199, 18 L.Ed.2d 270 (1967) (stating that "under the law of California ... a direct action against the insurer is not allowable until after the claimant shall have secured a final judgment against the insured"); Laguna Publ'g Co. v. Employers Reinsurance Corp., 617 F.Supp. 271, 272 (C.D.Cal.1985) (quoting Tashire).
 
 
 117
 We find these latter cases (including our own Ninth Circuit decision) persuasive and hold that MERLO § 8.24.090(B)(1) is preempted by California Insurance Code § 11580 to the extent that it expands the ability of Lodi to bring direct actions against a PRP's insurer before entry of a final judgment against the insured.
 
 3. Duplication
 
 118
 California courts have largely confined the duplication prong of the state preemption test to penal ordinances. Baldwin v. County of Tehama, 31 Cal. App.4th 166, 36 Cal.Rptr.2d 886, 894 (1994). The "reason that a conflict with the general laws under article XI, section 7 of the state Constitution is said to exist where an ordinance duplicates state law is that a conviction under the ordinance will operate to bar prosecution under state law for the same offense." Cohen v. Bd. of Supervisors, 40 Cal.3d 277, 219 Cal.Rptr. 467, 475 n. 12, 707 P.2d 840 (1985). No such situation exists here. Furthermore, California courts find preemption by duplication only where the ordinance is "coextensive with state law." Suter v. City of Lafayette, 57 Cal.App.4th 1109, 67 Cal. Rptr.2d 420, 428 (1997). MERLO treats the same subject as covered by state hazardous waste laws. It is however hardly co-extensive with HSAA. We find no preemption by duplication.
 
 4. Summary of Preemption Analysis
 
 119
 In sum, we hold that CERCLA and HSAA do not preempt the field of hazardous waste remediation, either explicitly or by implication. CERCLA permits both states and their political subdivisions to enact hazardous waste regulations and pursue additional remedies, as long as those remedies do not conflict or interfere with "the accomplishment and execution of [CERCLA's] full purpose and objective." Indus. Truck Ass'n, 125 F.3d at 1309. We also hold that MERLO is not preempted by the state law doctrine of preemption by duplication.
 
 
 120
 We conclude, however, that two provisions of MERLO — regarding the burden of proof for PRPs for establishing a defense to liability and that allow Lodi to require abatement procedures more stringent than the NCP — are preempted under the doctrine of conflict preemption. We further find that the sections of MERLO allowing Lodi to impose joint and several liability on other PRPs and to recover attorneys' fees may be preempted under the doctrine of conflict preemption if the district court finds that Lodi is a PRP. To the extent that MERLO protects Lodi from contribution claims by other PRPs, MERLO is also preempted if the district court finds that Lodi is a PRP (again, we express no opinion on whether Lodi is afforded protection from contribution by the Cooperative Agreement). The section of MERLO allowing direct actions against Insurers is preempted by California insurance law. Because we find that the "invalid provisions are easily severable from the remainder of the ordinance," the balance of MERLO — including its provisions regarding natural resource damages, provisions that allow abatement procedures less stringent than the NCP, and provisions that concern information-gathering — remain viable and are not preempted by either state or federal law, regardless of whether the district court finds that Lodi is a PRP. Cohen, 219 Cal.Rptr. at 476, 707 P.2d 840.
 
 C. OFFICIAL CAPACITY CLAIM
 
 121
 Fireman's Fund also appeals the district court's decision dismissing its claims brought against three individual defendants in their "official capacities": Lodi City Attorney Randall A. Hays, Enforcement Officer Richard C. Prima. Jr., and Enforcement Officer Fran E. Forkas.[27]
 
 
 122
 The district court dismissed these claims as duplicative of Fireman's Fund's claims against Lodi. Fireman's Fund asserts that the district court erred in so doing because the above-named municipal officers "are classic Ex[P]arte Young defendants" and the official capacity claims are necessary to "effectively foreclose any assertion by Lodi of Eleventh Amendment Immunity."[28] We agree with Fireman's Fund and reinstate the official capacity claims against Hays, Prima, and Forkas.[29]
 
 IV.
 CONCLUSION
 
 123
 In sum, we hold that the district court erred in abstaining from reaching Fireman's Fund's state law preemption claim. On the merits of the Insurers' state and federal preemption claims, we hold that CERCLA and HSAA do not preempt the field of hazardous waste remediation, either explicitly or by implication. We further hold that MERLO is not preempted by the state law doctrine of preemption by duplication.
 
 
 124
 We conclude, however, that several sections of MERLO are preempted by state and federal law under the doctrine of conflict preemption under the circumstances we have outlined above. We conclude that the balance of MERLO remains viable and is not preempted by either state or federal law. Finally, we reinstate Fireman's Fund's official capacity claims against Hays, Prima, and Forkas.
 
 
 125
 For the foregoing reasons, we AFFIRM IN PART, REVERSE IN PART, and REMAND for further proceedings consistent with this opinion and with instructions to the district court to determine if Lodi is a PRP.[30] Each party is to bear its own costs.
 
 
 
 Notes:
 
 
 *
 Judge Pregerson has voted to deny the petitions for rehearing en banc filed Aug. 20, 2002 by Fireman's Fund, Aug. 23, 2002 by Unigard, and Aug. 26, 2002 by Lodi. Judge Nelson and Judge Moskowitz recommend denying the petitions for rehearing en banc
 
 
 [1]
 The Honorable Barry Ted Moskowitz, United States District Judge for the Southern District of California, sitting by designation
 
 
 [2]
 Pursuant to a sunset clause, the original Carpenter-Presley-Tanner Hazardous Substance Account Act, also known as the California Superfund, became inoperative on January 1, 1999. HSAA, Cal. H & S Code § 25395. The reenacted HSAA went into effect on May 26, 1999, without a sunset clause. Actions and agreements pursuant to the previous version of HSAA are governed by the reenacted lawSee 1999 Ch. 23 § 3.
 
 
 [3]
 See Central Valley Regional Water Quality Control Board, "Dry Cleaners — A Major Source of PCE in Ground Water," pp. 20-21, March 27, 1992.
 
 
 [4]
 See Cal. H & S Code §§ 25355-6 (describing California's listing procedures).
 
 
 [5]
 The federal Environmental Protection Agency ("EPA") has never employed federal resources to initiate a comparable administrative proceeding at the federal level. The EPA has also never listed the Lodi Groundwater Site on the National Priorities List ("NPL"), a list of those sites that the EPA has determined are most in need of remediationSee 42 U.S.C. § 9605(a)(8)(B) (2001). Only NPL listed sites are eligible to receive federal Superfund dollars. See 40 C.F.R. § 300.425(b)(1).
 
 
 [6]
 DTSC had the authority to enter into the Cooperation Agreement under HSAA. As the Agreement itself states, DTSC entered into the Agreement "pursuant to its authority as set forth in Chapters 6.5 and 6.8 of the California Health and Safety Code [the HSAA], as well as its inherent governmental authority to resolve claims within its jurisdiction."See also Cal. H & S Code § 25355.5(a)(1)(C) (authorizing DTSC to enter into "agreements" with PRPs or "other parties"); Cal. H & S Code § 25358.3.
 
 
 [7]
 Under CERCLA, the cleanup of listed hazardous waste sites must be consistent with the National Contingency Plan ("NCP") — a plan promulgated by the EPA that "specifies the roles" of the federal, state, and local governments "in responding to hazardous waste sites, and establishes the procedures for making cleanup decisions."United States v. City of Denver, 100 F.3d 1509, 1511 (10th Cir. 1996); see 40 C.F.R. § 300 et seq.
 
 
 [8]
 On November 17, 1999, Lodi's City Council repealed Ordinance 1650 and reenacted an amended version of MERLO as Ordinance No. 1684. The amended version of MERLO became effective on December 17, 1999. Because we apply the law in effect at the time of decision, we must decide the issues raised in these related appeals based on the current version of MERLOSee Bradley v. Richmond Sch. Bd., 416 U.S. 696, 711, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974). Although the reenacted version of MERLO became effective while the Insurers' appeals were pending before this court, neither party has moved to dismiss the present appeals as moot. Moreover, our analysis of the two versions of MERLO reveals that Ordinance No. 1684 is substantially similar to the original version of MERLO. Indeed, with two exceptions, the Insurers argue that Lodi has merely repealed one preempted ordinance and replaced it with a second ordinance that is similarly preempted. Cf. Public Serv. Co. of Colorado v. Shoshone-Bannock Tribes, 30 F.3d 1203, 1205-06 (9th Cir.1994). Thus, the core disputes between the parties remain.
 Furthermore, the reenacted MERLO specifically provides that any action taken under the original MERLO "shall remain in effect" under the reenacted version of the Ordinance. The reenacted MERLO also provides that any changes made to the Ordinance as a result of the amendments apply retroactively to all proceedings initiated under the original MERLO. Finally, the general "savings clause" in Lodi Municipal Code § 1.01.080, which was enacted in 1985 well before Lodi adopted either version of MERLO, further establishes the continuing viability of any remedial enforcement actions initiated by Lodi before it repealed and reenacted MERLO.
 Accordingly, we hold that the controversy between the Insurers and Lodi is still "live" and that the repeal and reenactment of MERLO did not moot the Insurers' claims at issue in this appeal. We express no opinion, however, on whether the reenacted version of MERLO may moot or otherwise impact some of the issues to be considered by the district court for the first time on remand.
 
 
 [9]
 Additional individual defendants Steven H. Doto, John R. Till, Bret A. Stone, and Adam L. Babich were dismissed without prejudice by stipulation of the parties on September 21, 1998
 
 
 [10]
 We note that the district court did an admirable job in sorting through the varied and difficult issues raised in this highly complex case
 
 
 [11]
 ThePullman abstention doctrine derives its name from the case of Railroad Commission of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), and is "an equitable doctrine that allows federal courts to refrain from deciding sensitive federal constitutional questions when state law issues may moot or narrow the constitutional questions." The San Remo Hotel v. City of San Francisco, 145 F.3d 1095, 1104 (9th Cir. 1998). Pullman abstention is discussed in greater detail at Section III.A. infra.
 
 
 [12]
 We have held thatPullman abstention is not appropriate when the federal question at stake is one of federal preemption because preemption is not considered a "constitutional issue." Hotel Employees and Rest. Employees Int'l Union v. Nevada Gaming Comm'n, 984 F.2d 1507, 1512 (9th Cir.1993) ("Pullman abstention is not appropriate because preemption is not a constitutional issue."). But see International Bhd. of Elec. Workers, Local Union No. 1245 v. Public Serv. Comm'n of Nev., 614 F.2d 206 (9th Cir.1980) (invoking Pullman abstention in a case involving preemption under the National Labor Relations Act). In this case, however, the district court properly addressed the merits of the Insurers' federal preemption claims, and invoked Pullman abstention only to avoid reaching Fireman's Fund's additional claims for relief based on the Due Process, Equal Protection, and Contracts Clauses of the U.S. Constitution.
 
 
 [13]
 Both Fireman's Fund and Lodi agree that the even if the district court did not err in abstaining, it erred in dismissing the Fireman's Fund's remaining federal and state constitutional claims; the district court instead should have stayed the action and retained jurisdiction over the remaining federal claims pending resolution of the relevant state law issues in state courtSee International Bhd. of Elec. Workers, 614 F.2d at 213.
 
 
 [14]
 Several district courts in other circuits have addressed this question, however. In the wake of the 1996 SARA amendments to CERCLA, these district courts have uniformly held that a municipality may not bring a CERCLA cause of action "as a public trustee" of a state's natural resources unless the municipality has been appointed by the governor of its respective stateSee, e.g., Borough of Sayreville v. Union Carbide Corp., 923 F.Supp. 671, 680-81 (D.N.J.1996); Borough of Rockaway v. Klockner & Klockner, 811 F.Supp. 1039, 1049-51 (D.N.J.1993); City of Toledo v. Beazer Materials & Servs., Inc., 833 F.Supp. 646, 652 (N.D.Ohio 1993); City of Heath v. Ashland Oil, Inc., 834 F.Supp. 971, 976-77 (S.D.Ohio 1993); Town of Bedford v. Raytheon Co., 755 F.Supp. 469, 471-73 (D.Mass. 1991).
 
 
 [15]
 We note that our holding is not inconsistent with the reasoning of other circuits that have held that litigants may not invoke state statutes in order to escape the application of CERCLA's provisions in the midst of hazardous waste litigationSee, e.g., PMC, Inc. v. Sherwin-Williams Co., 151 F.3d 610, 617-18 (7th Cir.1998); Bedford Affiliates v. Sills, 156 F.3d 416, 426-27 (2d Cir.1998); In re Reading Co., 115 F.3d 1111, 1117 (3d Cir.1997).
 
 
 [16]
 In so holding, however, we do not consider whether Lodi may be entitled to contribution protection as a result of the Cooperative Agreement between Lodi and California's DTSC
 
 
 [17]
 We note that MERLO's application is not limited to contaminated drinking water. It sweeps broadly, encompassing all types of environmental contamination that may result from the releases at issue here, and encompassing virtually all other instances of environmental contamination affecting Lodi or its environs. MERLO § 8.24.010(7)
 
 
 [18]
 It is important to remember that in many instances there is no solvent responsible party available to pay for site cleanup, and no insurance funds to be tapped. Such sites are often located in inner city neighborhoods, and overly ambitious liability requirements disproportionately discourage economic development in areas that need it mostSee California Center For Land Recycling, Strategies For Promoting Brownfield Reuse In California (1998).
 
 
 [19]
 In fact, the original version of MERLO — Ordinance 1650 — specifically stated that Lodi may recover all costs "not inconsistent with the NCP." The Insurers allege that Lodi specifically amended MERLO so that the revised version of the ordinance — Ordinance 1684 — omits any reference to the NCP and instead permits the City to recover all costs "not inconsistent with the requirements of this chapter." According to the Insurers, this amendment "masks rather than eliminates the problem."
 
 
 [20]
 However, local governments are entitled to the presumption of consistency when performing cleanups pursuant to one of several California code sections. For example, the Polanco Redevelopment Act provides that municipal redevelopment corporations performing cleanups under the provisions of the Act are afforded the presumption of consistency. As the district court inCity of Emeryville v. Elementis Pigments, Inc., 2001 WL 964230 (N.D.Cal.), correctly stated, "the [Polanco] Act provides that municipal redevelopment agencies that clean up property under state supervision may recover their costs to the extent that the DTSC could recover under CERCLA. Under CERCLA, state agencies such as the DTSC are considered "states" and are thus eligible to recover under Section 107(a)(4)(A)." Id. at *11 (citation omitted).
 
 
 [21]
 As contract interpretation is a matter of law, we interpret the Cooperative Agreement to require DTSC to act with Lodi in a consolidated effort, providing the oversight, consultation, and cooperation necessary and appropriate to ensure that the Lodi Groundwater Site is remediated in a timely, competent, and cost-effective manner. In exchange for its ongoing and substantial services, DTSC will receive the consideration enumerated in the Cooperative Agreement
 
 
 [22]
 MERLO § 8.24.030(A)(7) keys response actions to Cal. H & S § 25356(c), which states that actions carried out with regard to listed sites shall comply "with the procedures, standards, and other requirements set forth in this chapter," which include adherence to the NCP. Cal. H & S § 25356(c) has been subsequently renumbered as § 25356(d)
 
 
 [23]
 The Cooperative Agreement also provides that the Work on the Lodi Groundwater Site comply with the NCP
 
 
 [24]
 We should note, however, that in some instances California law provides important advantages to municipalities that pursue hazardous waste cleanup under authority delegated by the state with oversight from a state agencySee, e.g., Cal. H & S § 25401 et seq. and § 57008 et seq. (the California Land Environmental Restoration and Reuse Act) (providing statutory immunity for local governments, owners and occupants, and lenders who conduct site cleanup pursuant to the terms of the Act).
 
 
 [25]
 We are aware of an out-of-circuit case indicating that local regulations less stringent than CERCLA are preempted. However, the statement inUnited States v. Akzo Coatings of America, Inc., 949 F.2d 1409, 1454 (6th Cir. 1991), that "CERCLA sets only a floor, not a ceiling, for environmental protection" was not essential to the holding, which turned on "the terms of the consent decree [at issue], and not the language of CERCLA." Id. at 1455. In any case, it is abundantly clear that local regulation less onerous than CERCLA is not preempted. Indeed, Congress has recognized that "local governments have developed and implemented innovative and effective brownfield programs." S.Rep.No. 107-2, at 2 (2001). The Brownfields Revitalization And Environmental Restoration Act of 2001 not only recognizes these programs but specifically recognizes the need to provide federal funding without compelling compliance with some burdensome and needless NCP requirements. Id.; see also 42 U.S.C. § 9604(k)(9)(A).
 
 
 [26]
 Lodi argues that MERLO's provisions allowing it to order abatement procedures more stringent than the NCP can not be preempted by CERCLA because of CERCLA's multiple savings clauses. Lodi's argument does not recognize the difference between field preemption and conflict preemption. We have indeed held that CERCLA's savings clauses make it clear that CERCLA does not preempt thefield of hazardous waste cleanup. See Section III(B)(1) supra. As this opinion makes clear, municipalities such as Lodi may exercise significant powers of self-protection in regulating hazardous waste cleanup. However, the powers of municipalities are not unlimited. Where municipal legislation comes into conflict with CERCLA, we find the municipal legislation to be preempted, just as other circuits have found conflict preemption in other circumstances, notwithstanding the same savings clauses cited by Lodi. See, e.g., Bedford Affiliates, 156 F.3d at 426-27 (holding application of certain State law remedies was preempted by CERCLA and reasoning that CERCLA "does not expressly preempt state law" but where State or local law "stands as an obstacle to the accomplishment and execution of the full purpose and objectives of Congress," it is preempted); Reading, 115 F.3d at 1117 (holding that CERCLA preempted application of certain contribution and restitution remedies "because the state law remedies obstruct the intent of Congress ... [by thwarting] the efficient resolution of environmental disputes"); Sherwin-Williams, 151 F.3d at 618 (holding that the purpose of CERCLA's savings clauses is "merely to nix an inference that the statute in which [they] appear[] is intended to be the exclusive remedy for harms caused by violation of the statute," and holding application of certain provisions of State law preempted by CERCLA). Lodi also points out that the NCP alludes to standards that are more stringent than federal requirements. First, the context in which "more stringent" requirements occur in the NCP is far removed from concerns at issue in this case.
 Second, Lodi cites to sections of the NCP mentioning more stringent State requirements. We have rejected the Insurers' argument that by referring to States but not political subdivisions in the text of CERCLA, Congress intended to leave room for supplemental State legislation but to prohibit all supplemental municipal legislation. However, this does not mean that Lodi can assume the mantle of the "State" or the breadth of the State's powers in all circumstances. We have previously distinguished between local governmental units, such as municipalities, and "States" with regard to various applications of CERCLA. See Wash. State Dept. of Transp., 59 F.3d at 800-01; Norton Sound, 138 F.3d at 1284. Our holding here concerns cleanup procedures promulgated by municipalities and other local government entities.
 
 
 [27]
 Fireman's Fund does not appeal the district court's dismissal of Fireman's Fund's official capacity claims against Michael C. Donovan and the Law Firm of Zevnik, Horton, Guibord & McGovern, L.L.P
 
 
 [28]
 "The Eleventh Amendment bars suits which seek either damages or injunctive relief against a state, an `arm of the state,' its instrumentalities, or its agencies."Franceschi v. Schwartz, 57 F.3d 828, 831 (9th Cir.1995). However, under Ex Parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), "the Eleventh Amendment does not bar actions seeking only prospective declaratory or injunctive relief against state officers in their official capacities." Los Angeles County Bar Assoc. v. Eu, 979 F.2d 697, 704 (9th Cir. 1992).
 
 
 [29]
 Lodi asserts that the official capacity claims against these three municipal officers were also dismissed by the district court on qualified immunity grounds. On the contrary, the district court dismissed theofficial capacity claims as duplicative of the claims against the City, and dismissed the "remaining individual capacity claims" on qualified immunity grounds. Fireman's Fund, 41 F.Supp.2d at 1106 (emphasis added).
 
 
 [30]
 Fireman's Fund and Unigard argue that Lodi is a PRP as a matter of law as a result of its agreement with the DTSC. This issue has not been fully briefed on appeal and we leave it to the district court to consider this argument in the first instance