**UNITED STATES of America**

v.

**UNION CORP.; Metal Bank of America; Irvin G. Schorsch, Jr.; and John B. Schorsch**

v.

**Consolidated Edison Co. of New York; Public Service Electric & Gas Co. of New Jersey; and Monsanto Co.**

No. CIV.A.9–01589.

United States District Court, E.D. Pennsylvania.

June 20, 2003.

Darlene Heep, City of Philadelphia Law Department, Itzchak E. Kornfeld, Obermayer Rebmann Maxwell & Hippel LLP, Kenneth S. Cooper, Kathy A. O'Neill, White and Williams, Philadelphia, PA, Robert Toland, Campbell Campbell Ed-

wards & Conroy, Wayne, PA, for Defendants.

### *MEMORANDUM*

GILES, Chief Judge.

## *I. INTRODUCTION*

In 1980, the United States ("Plaintiff" or "the Government") sued individual defendants Irvin G. Schorsch, Jr. and John B. Schorsch, and corporate defendants Union Corporation and Metal Bank of America, Inc. (collectively "the Metal Bank defendants" or "third-party plaintiffs"), seeking reimbursement for past and future response costs to investigate the Cottman Avenue Superfund site (".the Site") in Philadelphia and for enforcement pursuant to section 107 of the Comprehensive Environmental, Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9607. The Government also sought injunctive relief and remediation of the site pursuant to section 7003 of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6973. The defendants filed a third-party complaint against Consolidated Edison Company ("ConEd"), Public Service Electric & Gas Company of New Jersey ("PSE & G") and against the Monsanto Chemical Company ("Monsanto"). Monsanto's subsequent motion to dismiss was not ruled upon pursuant to the court's order of March 30, 1981 which stayed all deadlines in the third-party action. This matter was placed in suspense in 1983 pending attempted remediation of the Site but was restored to the court's active trial docket in 1998, upon the Government's claim that remediation had failed or had not addressed all contamination concerns.

On September 22, 1999, the Metal Bank defendants filed a Second Amended Third–Party Complaint against ConEd, PSE & G and Monsanto. In November 1999, the City of Philadelphia ("the City") was permitted to intervene as plaintiff on the condition that the United States file an amended complaint. On March 1, 2000 defendants filed an Amended and Restated Counterclaim seeking, *inter alia*, contribution from the City toward response costs pursuant to CERCLA and the Pennsylvania Uniform Contribution Among Tortfeasors Act ("PUCTA"), 42 Pa. Cons.Stat. Ann. § 8321 *et seq.* That filing was stricken by the court's order of June 13, 2000.

On May 4, 2000, a number of utility companies ("the utilities") sought leave to intervene as third-party defendants and on July 26, 2000, filed their claims against the Metal Bank defendants in a pleading styled as a third-party complaint. The Metal Bank defendants answered that pleading and on December 6, 2000, filed another third-party complaint ("Third Amended Third–Party Complaint") asserting claims against the utilities and against ConEd, PSE & G, Monsanto and the City.

On June 11, 2002, prior to trial of Phase I issues, defendants filed a motion for summary judgment seeking, *inter alia*, that 1) the City be stricken as intervenor, and 2) defendants' counterclaims against the City be deemed a third party complaint. On June 19, 2002, the City moved to withdraw as plaintiff intervenor. On July 3, 2002 the court denied defendants' motion and granted the City's motion. However, because of defendants' December 2000 pleading, the City remained a third-party defendant.

Following extensive discovery and pretrial proceedings, trial was phased as follows: Phase One would determine whether defendants were liable and whether response costs were incurred by the Government; Phase Two would determine whether the Government's response costs, if any, were recoverable and reasonable, as well as determine the scope of any further remedial action; and Phase Three would de-

termine the liability, if any, of any third-party defendant.

Following trial in Phase 1, this court resolved Phase One issues in favor of the Government in an opinion issued January 21, 2003. *See U.S. v. Union Corp.,* 259 F.Supp.2d 356 (E.D.Pa.2003). Monsanto and the City requested and were granted leave to file the present motions for summary judgment. For the reasons that follow, the City's motion is denied and Monsanto's motion is granted.

## II. FACTUAL BACKGROUND

Consistent with the review standards applicable to a motion for summary judgment, Fed.R.Civ.P. 56, the alleged facts, viewed in the light most favorable to the non-moving party, follow. The factual background of the underlying case is outlined in detail in *U.S. v. Union Corp.,* 259 F.Supp.2d 356 (E.D.Pa.2003). The court only relates those facts necessary for an understanding of the instant motions.

The Metal Bank Superfund Site located at 7301 Milnor Street near Cottman Avenue in Philadelphia is contaminated with PCBs and other hazardous substances traceable, at least in part, to Metal Bank's transformer reclamation operations on the Site. The City utilizes a combined sewer system in the neighborhood of the Site and has a municipal combined stormwater/sanitary sewer outfall ("CSO") at the foot of Cottman Avenue.

In the late 1800s through the 1940s, engineers designed combined sewers (sewers which carry sanitary sewage and storm runoff in a single pipe) to convey sewage, horse manure, street and rooftop runoff, and garbage from city streets to the nearest receiving body of water. As of the early 1950s, most sewer systems were constructed as separate systems (sanitary sewage in one pipe; storm water sewage conveyed in another pipe). However, in the late 1950s, treating wastewater became the municipal standard. Interceptors were built to transport all wastewater (from either combined or separate systems) to treatment plants. Nevertheless, during heavy storms, the total volume of the wastewater could become too large for the interceptors to handle. To protect treatment plants and avoid sewer back-ups into homes, businesses, and streets, the overflows were discharged into bodies of water like the Delaware River. The City's CSO is the first overflow for the sewage interceptor/ collector serving northeast Philadelphia and empties into the northeastern corner of the embayment adjacent to the Metal Bank property during periods of heavy rainfall. The Metal Bank defendants assert that the City has thereby discharged waste containing hazardous materials into the mudflat area from the CSO.

Prior to implementation of PCB ban regulations in 1977 pursuant to the Toxic Substance Control Act ("TSCA"), Monsanto was the sole manufacturer and seller of PCBs in the United States. PCBs were utilized for various industrial purposes, including as a constituent of insulating fluid used in electrical transformers and capacitors. Although defendants did not receive PCBs or PCB-laden materials directly from Monsanto, some of the transformers and capacitors purchased by the utility companies and ultimately processed at the Site contained PCBs.

## III. ANALYSIS

A summary judgment motion should be granted where it is clear that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).

### A. The City's Motion Fails As A Matter of Law

The City argues that it is entitled to summary judgment because 1) it is not a

responsible party within the meaning of CERCLA; 2) there was no release or threatened release at the Site of a hazardous substance from a City of Philadelphia facility; 3) no response costs incurred by the United States can be attributed to the City; 4) the City cannot be held liable for contribution pursuant to the Pennsylvania Uniform Contribution Among Joint Tortfeasors Act, 42 Pa. Cons.Stat. Ann. §§ 8321–27 ("PUCTA") as it is not liable under CERCLA and is therefore not a joint tortfeasor; and 5) the City is immune from liability under the Pennsylvania Political Subdivision Tort Claims Act, 42 Pa. C.S. § 541 *et seq.* ("PSTCA").

■ In opposition, defendants argue that 1) this court's case management order precluded discovery from third party defendants regarding facts specific to third party claims and, consequently, the record is incomplete; 2) the City is an owner/operator of the CSO and of the beach/ mudflat area which comprises a portion of the superfund site; 3) the CSO is a facility from which releases have occurred and threaten to occur; 4) the City is liable for contribution under RCRA; and, 5) the City is liable for contribution under a state law public nuisance theory.

The RCRA and public nuisance claims were not pled in the third-party complaint. They were advanced in the defendants' response to the City's summary judgment motion. The City's reply brief did not address them. Because they were not claims pled, the court will not address them.

## 1. CERCLA's Remedial Scheme

CERCLA was enacted in 1980 in response to serious environmental and health risks resulting from the existence of inactive hazardous waste sites. *U.S. v. Bestfoods,* 524 U.S. 51, 55, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998); H.R.Rep. No. 1016(I), 96th Cong., 2d Sess. 1 (1980), reprinted in 1980 U.S.C.C.A.N. 6119, 6119. It encourages the United States to use the "Hazardous Substance Superfund" to finance cleanup efforts. *See* 42 U.S.C. §§ 9601(11), 9604; 26 U.S.C. § 9507. The fund is replenished by recovery civil actions against responsible parties under § 107 of the Act.

■ In 1986, Congress passed the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), 42 U.S.C. §§ 9601–9675, amending CERCLA and adding, *inter alia,* CERCLA § 113(f), which explicitly provides that

> Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title.

42 U.S.C.A. § 9613(f)(1). Thus, an entity found by the court to be a responsible party within the meaning of CERCLA may seek contribution from other polluters. The party seeking contribution bears the burden of establishing a reasonable basis for apportioning liability to a third party and has the burden of proving each element of the claim by a preponderance of the evidence. 42 U.S.C.A. § 9613; *U.S. v. Pesses,* 120 F.Supp.2d 503 (W.D.Pa. 2000). The contribution liability of a responsible person under § 113 corresponds to that party's equitable share of the total liability. *Fireman's Fund Ins. Co. v. City of Lodi, California,* 302 F.3d 928, 945 (9th Cir.2002) (internal citations omitted). While a defendant in a § 107 cost-recovery action may be jointly and severally liable for the total response cost incurred by the Government, "[t]hird-party defendants ... are, by judicial precedent, only severally liable for contribution under § 113(f)(1)." *State of N.J., Dept. of Environmental Protection v. Gloucester Environmental Management Services,* 821 F.Supp. 999, 1004

(D.N.J.1993) (citing *U.S. v. Kramer,* 757 F.Supp. 397, 414 (D.N.J.1991)). In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate. *Fireman's Fund,* 302 F.3d at 945.

To establish the City's liability under CERCLA, the third party plaintiffs must show that the City 1) "owned or operated" a "facility" from which there was a "release" or "threatened release" of a hazardous substance, 2) is a "potentially responsible person," and 3) the third party plaintiffs incurred · necessary clean-up costs "consistent with the national contingency plan." 42 U.S.C. § 9601(9), 9601(20), 9601(22), 9605, 9607(a); *U.S. v. CDMG Realty,* 96 F.3d 706, 712 (3d Cir. 1996) (citing *U.S. v. Alcan Aluminum Corp.,* 964 F.2d 252, 258–59 (3d Cir.1992)).

### a. The City's CSO is a "facility" within the meaning of CERCLA

■ The court construes the City's assertion that "there was no release or threatened release at the Site of a hazardous substance from a City of Philadelphia facility" as arguing both 1) that the City's CSO is not a facility within the meaning of CERCLA, and 2) that there was no release of contaminants from the CSO to the Site.

The term "facility" means any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be · located .... 42 U.S.C. § 9601(9)(B); *see also New York v. Shore Realty Corp.,* 759 F.2d 1032, 1043 n. 15 (2d Cir.1985) ("facility" is defined broadly to include any property where a hazardous substance is present).

The only circuit court that has addressed the issue of a municipality's liability for hazardous substances found in a public sewer system concluded that publicly owned treatment works ("POTWs") were not excluded from "facilities" subject to CERCLA liability. *See Westfarm Associates Limited Partnership v. Washington Suburban Sanitary Commission,* 66 F.3d 669 (4th Cir.1995) *cert. denied,* 517 U.S. 1103, 116 S.Ct. 1318, 134 L.Ed.2d 471 (1996). The fourth circuit rejected the argument that CERCLA's parenthetical language "including any pipe into a sewer or publicly owned treatment works," would be surplusage if Congress had intended to include POTWs within the definition of "facility." Reading the statute as a whole, the court reasoned as follows:

> Congress expressly abrogated state sovereign immunity under CERCLA, thereby subjecting "facilities" owned and operated by state governments to liability. A narrow exception to the definition of "owner or operator," however, was carved to exclude state and local governments from liability when they have acquired ownership of a facility involuntarily through bankruptcy, tax delinquency, abandonment, or other circumstances in which the government involuntarily acquires title. The traditional maxim of statutory interpretation that the inclusion of one is the exclusion of the other, reminds us that if Congress had intended to exclude state and local governments from liability in other situations such as when they, through their POTWS, are otherwise liable under CERCLA Congress would have either: (a) excluded all state and local governments from the definition of "owner or operator," rather· than limiting the exclusion to the involuntary acquisition situation; or (b) included

POTWs in the list of entities excluded from the definition of "owner or operator."

*Id.* at 678 (internal citations omitted). The fourth circuit thus concluded that "in the context of the entire statute, ... Congress added the language, 'including any pipe into a sewer or publicly owned treatment works,' to emphasize the point that pipes leading into sewers or POTWs are the responsibility of the owner or operator of the pipes, not the sewer or POTW." *Id.;* see also *B.F. Goodrich Co. v. Murtha,* 958 F.2d 1192, 1199 (2d Cir.1992) (express exceptions to liability are strong evidence that municipalities are otherwise subject to CERCLA liability).

Cases cited by the City do not support its argument for a *per se* exemption. In *Fireman's Fund,* 302 F.3d at 934, the issue before the court was whether a local law analogous to CERCLA was preempted by federal and state law. The ninth circuit remanded the case to the district court to determine whether the municipality was a potentially liable person under CERCLA. *Id.* at 946. In *Lincoln Properties, Limited v. Higgins,* 823 F.Supp. 1528, 1538–39 (E.D.Cal.1992), the contamination arose from leakage of chemicals from a sewer line. The county's ownership had not been established with regard to the portion of the leaking sewer line over which the county had been granted a right of way, thus precluding summary judgment on the issue of owner/operator liability. *Id.*

This court adopts the fourth circuit's reasoning and its conclusion that Congress did not intend to exclude municipal sewer systems from CERCLA's definition of "facilities."

The City's assertion that if the court requires it to remain a party it will open the door for City liability whenever anyone releases a listed substance into a municipal sewer is incorrect. Without question, it would be inequitable to hold a municipality strictly liable merely because it owns a sewer system into which an unknown person introduces a hazardous substance. *See Fireman's Fund,* 302 F.3d at 946. A municipality in such a situation may demonstrate that it is an "innocent owner," a defense under CERCLA.

**b. At This Time, The Innocent Owner Defense Is Not Made Out**

■ Although CERCLA is construed liberally and interpreted as establishing a strict liability scheme, *United States v. Monsanto Co.,* 858 F.2d 160, 167 & n. 11 (4th Cir.1988) *cert. denied,* 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989), it is subject to narrow defenses for damages "caused solely by" acts of God, war, or third parties. 42 U.S.C. § 9607(b)(1)-(3). The third party defense is that an owner is not liable under CERCLA if it can show by a preponderance of the evidence that 1) the release or threat of release of a hazardous substance and the damages resulting therefrom "were caused solely by another party," unrelated to the owner by employment, agency or contract; and 2) the owner (a) "exercised due care with respect to the hazardous substances concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances," and (b) "took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions." 42 U.S.C. § 9607(b)(3).

The City asserts that this court's findings and the expert testimony in Phase I establish that the Metal Bank defendants and not the City released the contaminants found in the mudflats. Thus, the City argues that since 1) defendants were not acting as agents, employees or pursuant to any contract with the City; and 2) blatant violation of the law by defendants was not

foreseeable, the City is necessarily released from liability. This is not correct.

The court did not find that the contamination at the Site originated exclusively with the activities of the Metal Bank defendants, but only that the City's CSO was not a significant source of contamination. *See U.S. v. Union Corp.*, 259 F.Supp.2d 356, 378 (E.D.Pa.2003). The Metal Bank defendants have alleged that at least some of the contaminants found in the mudflats flowed from the City's CSO rather than from the Metal Bank property. They correctly point out that, in accordance with this court's case management order, the sole issue addressed in Phase I was that of defendants' own liability and the present factual record is incomplete with respect to third-party liability. Whether the defense will be necessary, applicable or proven must await the close of third-party discovery and decision on a dispositive motion.

### c. Legally, The City Could Be a Responsible Party

▬ An entity is a responsible party within the meaning of CERCLA if it is: 1) the current owner and operator of the facility, 2) a person who owned or operated a facility at the time of disposal of the hazardous substance, 3) a person who by contract, agreement, or otherwise arranged for disposal or treatment of hazardous substances, or 4) a person who transported hazardous substances to a facility. 42 U.S.C. § 9607(a)(1)-(4). "[M]unicipalities are explicitly included as PRPs [potentially responsible persons] for purposes of the liability provisions of 42 U.S.C. § 9607(a)." *State of N.J., Dept. of Environmental Protection*, 821 F.Supp. 999 (D.N.J.1993).

### i. The City is an Owner/Operator

It is undisputed that the City is the current owner and operator of the CSO and that it owned and operated the CSO at the time of the alleged releases of hazard-

ous substances from the CSO into the mudflat area. *See* Ans. of City of Phila. to Third–Party Compl. Of Metal Bank Defs., Dec. 29, 2000 ("[t]he City owns and operates, through its Water Department . . . a combined sanitary and storm water collection and discharge system."). The contaminated mudflat area, while not part of the Metal Bank property, and not the property of the City, is part of the Superfund Site. *See U.S. v. Union Corp.*, 259 F.Supp.2d 356, 364 (E.D.Pa.2003). Thus, the City may be liable under CERCLA if the CSO released contaminants into the mudflat.

### ii. The City is Not Entitled to Collateral Estoppel

▬ The City's collateral estoppel argument is without merit. Under Pennsylvania law, the doctrine of collateral estoppel applies where 1) an issue decided in a prior action is identical to one presented in a later action; 2) the prior action resulted in a final judgment on the merits; (3) the party against whom collateral estoppel is asserted was a party to the prior action, or is in privity with a party to the prior action; and (4) the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the prior action. *Jones v. United Parcel Service*, 214 F.3d 402, 405—406 (3d Cir. 2000) (citing *Rue v. K–Mart Corp.*, 552 Pa. 13, 713 A.2d 82, 84 (1998)).

The issue in Phase I of the instant litigation was the liability, if any, of the Metal Bank defendants. The court's finding that the contamination at the Site was traceable in part to Metal Bank's recycling operations does not foreclose a finding that some portion of the contamination is traceable to the City's CSO. Since the issue previously decided by the court was not identical to the one presented here, the City is not entitled to collateral estoppel.

### 2. Liability under PUCTA and PSTCA

The City argues that it is immune from liability under the Pennsylvania Uniform Contribution Among Joint Tortfeasors Act, 42 Pa. Cons.Stat. Ann. §§ 8321–27 ("PUCTA") because it is not liable under CERCLA and is therefore not a joint tortfeasor.

PUCTA provides for a right of contribution and applies "if it is established that those allegedly culpable are joint tortfeasors." *Rocco v. Johns–Manville Corp.,* 754 F.2d 110, 115 (3d Cir.1985); *Whitehill v. Anderson,* 1995 WL 870785, 27 Pa. D. & C. 4th 47 (Pa.Com.Pl.1995). The Act defines joint tortfeasors as "two or more persons jointly or severally liable in tort for the same injury to persons or property." 42 Pa.C.S. § 8322. Joint tortfeasors are parties who either act together in committing a wrong or whose acts, if independent of each other, unite to form a single injury. *See Foflygen v. R. Zemel, M.D.,* 420 Pa.Super. 18, 615 A.2d 1345 (1992). However, "[w]here '(t)he acts of the original wrongdoer and the (alleged joint tortfeasor) are severable as to time, neither having the opportunity to guard against the other's acts, and each breaching a different duty owed to the injured plaintiff,' the persons are not joint tortfeasors." *Klotz v. Superior Elec. Products Corp.,* 498 F.Supp. 1099, 1100–01 (E.D.Pa. 1980) (quoting *Lasprogata v. Qualls,* 263 Pa.Super. 174, 397 A.2d 803, 805 (1979)).

Since the City's argument is premised upon the assertion that it is not liable under CERCLA, the argument fails. The court has already held that the City could be severally liable under CERCLA.

The City also argues that PUCTA does not invalidate the doctrine of sovereign immunity and raises the immunity defense pursuant to the Political Subdivision Tort Claims Act, 42 Pa.C.S. § 8541 *et seq.* ("PSTCA"). PSTCA provides, in pertinent part, "Except as otherwise provided in this subchapter, no local agency shall be liable for any damages on account of an injury to a person or property caused by an act of the local agency or an employee thereof or any other person." 42 Pa. C.S.A. § 8541. Acknowledging that PSTCA is subject to certain exceptions including, *inter alia,* the "dangerous condition of facilities of steam, sewer, water, gas or electric systems," the City nonetheless argues that it is not liable under this provision which is limited to injuries or damages resulting from negligent maintenance of physical facilities or equipment by the City, of which there is no proof.

The City cannot interpose the immunity defense of a state tort claims act as a bar against claims under CERCLA. Moreover, if the third-party plaintiffs' common law public nuisance claim had been properly pled, as to them, the immunity defense would require a determination of whether the contamination alleged to have emanated from the City's CSO is the result of the City's negligent maintenance. The inquiry would be the same essentially as that required by the CERCLA innocent owner defense and for the reasons stated previously could not be resolved on the basis of the current record. The City's motion for summary judgment is denied.

### B. Monsanto's Motion Succeeds As A Matter Of Law

Monsanto argues that it is entitled to summary judgment because 1) it is not a potentially responsible party under CERCLA or RCRA, 2) it is not a joint tortfeasor under Pennsylvania law, 3) the Metal Bank defendants have no right to common law indemnity because their liability is based upon their own active conduct, 4) to the extent that the Metal Bank defendants have attempted to couch their claims as product liability or abnormally dangerous activity claims, they cannot circumvent the bar to contribution and indemnification

claims, and 5) Monsanto is not liable in trespass.

In response, the Metal Bank defendants assert that the summary judgment motion is premature under the court's case management order. They also argue that Monsanto is liable for contribution and/or indemnification 1) under "design defect" and "failure-to-warn" theories of strict products liability, 2) for engaging in the abnormally dangerous activity of manufacturing and distributing PCBs, 3) for RCRA violations, 4) for common law trespass and public nuisance, and 5) for intentional torts pursuant to the Restatement (Second) of Torts, § 8A.

The state law public nuisance and intentional tort claims were not pled in either the Second Amended Third–Party Complaint or in the Third Amended Third–Party Complaint. They were raised for the first time in the third-party plaintiffs' response to Monsanto's summary judgment motion. The court will not address them.

### 1. Monsanto is not a "responsible person" within the meaning of CERCLA

■ CERCLA liability requires a finding that the allegedly responsible party was 1) a past or present owner/ operator of a facility, 2) a person who arranged for disposal or treatment of hazardous substances, or 3) a person who transported hazardous substances to a facility. 42 U.S.C. § 9607(a)(1)-(4).

■ It is undisputed that Monsanto is neither an owner/ operator of a facility nor a transporter of hazardous substances. In addition, CERCLA liability does not extend to the seller of a new or useful product because such a sale does not constitute an arrangement for disposal of a hazardous substance. *See Pneumo Abex Corp. v. High Point, Thomasville & Denton R.R. Co.*, 142 F.3d 769 (4th Cir.1998), *cert. denied*, 525 U.S. 963, 119 S.Ct. 407, 142 L.Ed.2d 330 (1998); *AM International Inc. v. International Forging Equipment Corp.*, 982 F.2d 989, 999 (6th Cir.1993); *Florida Power & Light Co. v. Allis Chalmers Corp.*, 893 F.2d 1313, 1317 (11th Cir. 1990); *Dayton Indep. School Dist. v. U.S. Mineral Prods. Co.*, 906 F.2d 1059, 1065 (5th Cir.1990); *3550 Stevens Creek v. Barclays Bank of California*, 915 F.2d 1355 (9th Cir.1990); *United States v. Pesses*, No. 90–0654, 1998 WL 937235, *4 (W.D.Pa. May 6, 1998); *Prudential Ins. Co. of Am. v. United States Gypsum Co.*, 711 F.Supp. 1244, 1254 (D.N.J.1989).

■ In determining whether a transaction was an arrangement for disposal of hazardous substances or a sale of valuable materials, courts consider 1) the intent of the parties to the contract as to whether the materials were to be reused entirely or reclaimed and then reused, 2) the value of the materials sold, 3) the usefulness of the materials in the condition in which they were sold, and 4) the state of the product at the time of transferral. *Pneumo Abex Corp.*, 142 F.3d at 775 (internal citations omitted).[1]

---

1. Thus, for example, in *Pneumo Abex Corp.*, 142 F.3d at 775, the fourth circuit held that the seller of bearings to a railroad parts foundry was not liable under CERCLA because "the process of creating new wheel bearings from the used wheel bearings sent to the foundry indicate[d] that the conversion agreements ... were not transactions for disposal." *Id.* The court emphasized that "[t]he intent of both parties ... was that the wheel bearings would be reused in their entirety in the creation of new wheel bearings" and "[t]he Foundry paid the appellants for the bearings; the appellants did not pay the Foundry to dispose of unwanted metal." *Id.*

Similarly, in *U.S. Mineral Products Co.*, 906 F.2d at 1064, the fifth circuit held that suppliers and manufacturers did not "dispose" of the hazardous substance asbestos by placing it in the building materials installed in certain buildings. Instead, the court found it "clear

Monsanto did not enter into a transaction for the disposal of PCBs. It manufactured PCBs as a product useful for a number of industrial purposes, including as a constituent of insulating fluid used in electrical transformers and capacitors. The PCBs were sold for valuable consideration to transformer manufacturers who incorporated the PCBs into transformers which they then sold to utility companies and other consumers. The court cannot find that Monsanto's sale of PCBs to manufacturers of transformers and capacitors was an arrangement for the disposal of hazardous waste within the meaning of CERCLA.

Since Monsanto is not potentially liable to the Government, it cannot be derivatively liable to the Metal Bank defendants for contribution on the CERCLA claims. *See* 42 U.S.C.A. § 9613(f)(1)("Any person may seek contribution from any other person *who is liable or potentially liable* under section § 9607(a)")(emphasis added).

### 2. Monsanto Is Not a Responsible Party Under RCRA

██ RCRA liability is imposed upon "any person ... who has contributed or who is contributing to ... [the] handling, storage, treatment, transportation or disposal" of "any solid waste or hazardous waste" where such activity "may present an imminent and substantial endangerment to health or the environment ...." 42 U.S.C. § 6973.

RCRA defined "disposal" as the "discharge, deposit, injection, dumping, spilling, leaking or placing of any solid waste or hazardous substance into or on any land or water so that such solid waste or hazardous substance or any constituent thereof may enter the environment ..." 42 U.S.C. § 6903(3); *see also* 40 C.F.R.

§ 260.10 (Discharge or hazardous waste discharge means the accidental or intentional spilling, leaking, pumping, pouring, emitting, emptying, or dumping of hazardous waste into or on any land or water).

Although the statutory requirements are somewhat different under each statute, the reasons justifying the court's holding that Monsanto did not arrange for disposal within the meaning of CERCLA also foreclose liability for disposal pursuant to RCRA. The sale of a useful product does not constitute the "handling, storage, treatment, transportation or disposal of any solid waste or hazardous waste" required by RCRA. *See United States v. Westinghouse Elec. Corp.,* 1983 WL 160587, (S.D.Ind. June 29, 1983)(dismissing CERCLA and RCRA claims against Monsanto because "[t]he claims of the United States are not based on its control of the manufactured product of Monsanto as sold to Westinghouse but are based on Westinghouse's waste product disposition in issue"). The PCBs sold by Monsanto to its customers were transferred as a valuable commodity and the link between their sale by Monsanto and the ultimate discharge of contaminants, including PCBs, onto the Site is too attenuated to justify imposing liability upon the manufacturer. Thus, Monsanto is not liable for contribution or indemnification under RCRA.

### 3. Monsanto Is Not Liable Under State Law

The third-party plaintiffs assert contribution and indemnification claims against Monsanto based upon state law theories of strict product liability, abnormally dangerous activity and trespass. Pennsylvania law applies.

that appellants manufactured the asbestos-containing building materials for the primary purpose of creating a new useful and market-

able product for the construction industry." *Id.* at 1065.

### a. Strict Product Liability

 The Pennsylvania Supreme Court has adopted the strict products liability doctrine in Section 402A of the Restatement (Second) of Torts.[2] *Webb v. Zern*, 422 Pa. 424, 220 A.2d 853 (1966). To prevail under section 402A, a plaintiff must prove the existence of 1) a product; 2) the sale of a product; 3) a user or consumer; 4) a defective condition, unreasonably dangerous; and 5) causation. *Ettinger v. Triangle–Pacific Corp.*, 799 A.2d 95, 102 (Pa.Super.2002). "If any of these requisite elements remains unsatisfied, § 402A has no applicability." *Id.* (citing *Schriner v. Pennsylvania Power & Light Co.*, 348 Pa.Super. 177, 501 A.2d 1128, 1132 (1985)).

 "[A] product is defective if it lacks any element necessary to make it safe for its intended use or contains any condition that makes it unsafe for its intended use." *Kalik v. Allis–Chalmers Corp.*, 658 F.Supp. 631, 635 (W.D.Pa.1987) (citing *Berkebile v. Brantly Helicopter Corp.*, 462 Pa. 83, 337 A.2d 893 (1975)); *Azzarello v. Black Bros. Co., Inc.*, 480 Pa. 547, 391 A.2d 1020 (1978)). "There are three different types of defective conditions that can give rise to a strict liability claim: design defect, manufacturing defect, and failure-to-warn defect." *Phillips v. A–Best Products, Co.*, 542 Pa. 124, 665 A.2d 1167, 1170 (1995)(citing *Walton v. Avco Corp.*, 530 Pa. 568, 610 A.2d 454, 458 (1992)). The defect must have existed at the time that the product left the manufac-turer's hands. *Commonwealth v. United States Mineral Products Co.*, 809 A.2d 1000, 1027 (Pa.Cmwlth.2002).

 The third-party plaintiffs urge the court to find Monsanto liable on theories of design defect and failure-to-warn defect. Liability for a design defect attaches where there is a discrepancy between the design of a product causing injury and an alternative specification that would have avoided the injury. *Stecher v. Ford Motor Co.*, 779 A.2d 491, 502 (Pa.Super.2001). A product is defective due to a failure-to-warn where the product was "distributed without sufficient warnings to notify the ultimate user of the dangers inherent in the product." *Mackowick v. Westinghouse Electric*, 525 Pa. 52, 575 A.2d 100, 102 (1990). Under either theory, the third-party plaintiffs must show that the alleged defect rendered the product unfit for its intended purpose. This they cannot do.

 "The intended use of a product includes any use reasonably foreseeable to the manufacturer." *Kalik*, 658 F.Supp. at 635 (citing *Sheldon v. West Bend Equipment Corp.*, 718 F.2d 603, 608 (3d Cir. 1983)). As a matter of law, "the recycling of a product, after it has been destroyed, is not a *use* of the product reasonably foreseeable to the manufacturer." *Kalik*, 658 F.Supp. at 635 (citing *Johnson v. Murph Metals, Inc.*, 562 F.Supp. 246 (N.D.Tx.1983))(emphasis added).

---

**2.** Section 402A of the Restatement (Second) of Torts provides:

 (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
 (a) the seller is engaged in the business of selling such a product, and
 (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
 (2) The rule stated in Subsection (1) applies although
 (a) the seller has exercised all possible care in the preparation and sale of his product, and
 (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

In *Kalik,* claims brought by the owners of a site to recover cleanup costs of PCBs were found not to be actionable because the dismantling and processing of junk electrical components was not a reasonably foreseeable use of the manufacturers' products. 658 F.Supp. at 635; *see also Monsanto Co. v. Reed,* 950 S.W.2d 811, 814 (Ky.1997) ("[A]s a matter of law, that the dismantling and processing of junk electrical components was not a reasonably foreseeable use of GE's [electrical transformers]."); *High v. Westinghouse Elec. Corp.,* 559 So.2d 227, 227–230 (Fla. 3d DCA 1989), *decision approved in part, quashed in part,* 610 So.2d 1259 (Fla.1992) (as a matter of law, the unsealing, stripping, and dumping of the PCBs contained in defendant's transformers to salvage junk components were not reasonably foreseeable uses of the product and the employee was not an intended user); *Wingett v. Teledyne Indus., Inc.,* 479 N.E.2d 51, 56 (Ind. 1985) (a manufacturer's potential liability for products placed in the stream of commerce does not extend to the demolition of the product); *Johnson,* 562 F.Supp. at 249 (the creation of dangerous gases through the smelting of battery scrap metal is not a foreseeable "use" of a defendant's automotive batteries).

Here, the evidence shows that Monsanto sold PCBs for incorporation into dielectric fluid used in the manufacture of electrical transformers and capacitors. The transformers and capacitors containing the fluid were sold to consumers who used them for 20–30 years. The court finds that the defendants' discharge of PCBs when dielectric fluid was drained from transformers and capacitors to salvage iron casings and copper cores was not an intended or reasonably foreseeable use of Monsanto's product.

**b. Strict Liability for Abnormally Dangerous Activity**

 Third-party plaintiffs have asserted a claim against Monsanto for strict liability based upon the manufacture and sale of PCBs and argue that this qualifies as an abnormally dangerous or ultra-hazardous activity, entitling it to invoke strict liability principles. In opposition, Monsanto argues that it cannot be held liable for engaging in an abnormally dangerous activity based upon its manufacture of a nondefective product. The court agrees.

"While the common law doctrine of absolute liability is 'less than fully settled' in Pennsylvania ..., the Superior Court of Pennsylvania, in several cases, has adopted sections 519 and 520 of the Restatement (Second) of Torts for determining whether an activity is abnormally dangerous." *Banks v. Ashland Oil Co.,* 127 F.Supp.2d 679, 680 (E.D.Pa.2001)(internal citations omitted).[3]

"Pennsylvania use[s] the six factors of § 520 to balance policy reasons for and against the imposition of absolute liability." *Earp v. Andgrow Fertilizer, Inc.,* 1989 WL 1003890, *4 (Pa.Com.Pl. Oct 12, 1989) (citing *Albig v. Municipal Authority of Westmoreland County, et al.,* 348 Pa.Super. 505, 502 A.2d 658 (1985)).[4] "Illustrations

---

3. Section 519 of the Restatement (Second) of Torts provides:
 (1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.
 (2) This strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous.

4. Section 520 of the Restatement (Second) of Torts provides:
 In determining whether an activity is abnormally dangerous, the following factors are to be considered:
 (a) existence of a high degree of risk of some harm to the person, land or chattels of others;
 (b) likelihood that the harm that results from it will be great;

[of abnormally dangerous activities] in the Restatement range from blasting to the storage of large quantities of water on hilltops overlooking residential development." *Earp,* 1989 WL 1003890, *4.

However, [n]o court of th[e] Commonwealth [of Pennsylvania] has ever imposed liability on the manufacturer of a non-defective product for engaging in an abnormally dangerous activity. *Mazzillo ex rel. Estate of Mazzillo v. Banks,* 1987 WL 754879, *4 (Pa.Com.Pl.1987). "To recognize liability of a manufacturer or distributor would virtually make them the insurer for such products as explosives, hazardous chemicals or dangerous drugs even though such products are not negligently made nor contain any defects." *Id.* This interpretation would "give the doctrine of absolute liability an unduly expansive meaning." *Id.* Federal courts must "permit state courts to decide whether and to what extent they will expand state common law." *City of Philadelphia v. Beretta U.S.A. Corp.,* 277 F.3d 415, 421.

Other jurisdictions have made it clear that "ultrahazardousness or abnormal dangerousness is, in the contemplation of the law at least, a property not of substances, but of activities." *See, e.g., Indiana Harbor Belt R. Co. v. American Cyanamid Co.,* 916 F.2d 1174, 1181 (7th Cir.1990). Thus in *Indiana Harbor,* the seventh circuit explained that the relevant activity was not the manufacture of acrylonitrile, the toxic chemical involved in that case, but "the transportation of acrylonitrile by rail through populated areas." *Id.* The court held that "[w]hatever the situation under products liability law (section 402A of the Restatement), the manufacturer of a

product is not considered to be engaged in an abnormally dangerous activity merely because the product becomes dangerous when it is handled or used in some way after it leaves his premises, even if the danger is foreseeable." *Id.*

Similarly, in *Richmond, Fredericksburg and Potomac R. Co. v. Davis Industries, Inc.,* 787 F.Supp. 572, 575 (E.D.Va.1992), where a scrap recycling facility sued PRPs under CERCLA and one of the PRPs impleaded the manufacturer of PCB-containing air conditioners, the court held that liability could not be imposed upon the manufacturer for an abnormally dangerous activity. Explaining that a claim under § 519 could not be "saved by shifting the focus from the toxic substances contained in Carrier's gas air conditioners to Carrier's activity—manufacturing gas air conditioners containing PCBs," the court determined that "[t]o hold otherwise [would] convert[ ] the manufacturer into an insurer." *Id.; see also City of Bloomington, Ind. v. Westinghouse Elec. Corp.,* 891 F.2d 611, 614 (7th Cir.1989)(affirming dismissal of § 519 claim against Monsanto because "the harm to the City's sewage and landfill was not caused by any abnormally dangerous activity of Monsanto but by the buyer's failure to safeguard its waste.").

The court finds that the Pennsylvania Supreme Court would agree that abnormal dangerousness in the context of sections 519 and 520 of the Restatement (Second) of Torts is a property of *activities* and not of substances. Moreover, this court having found Monsanto not liable under principles of strict product liability, it would be incongruous to hold Monsanto liable under section 519 for manufacturing the same

(c) inability to eliminate the risk by the exercise of reasonable care;
(d) extent to which the activity is not a matter of common usage;
(e) inappropriateness of the activity to the place where it is carried on; and

(f) extent to which its value to the community is outweighed by its dangerous attributes.

product. It is not the role of federal courts to engage in "judicial activism," but rather to "apply the current law of the jurisdiction, and . . . leave it undisturbed," *Beretta U.S.A. Corp.*, 277 F.3d at 421 (citing *Leo v. Kerr–McGee Chem. Corp.*, 37 F.3d 96, 101 (3d Cir.1994) (quoting *City of Philadelphia v. Lead Indus. Ass'n*, 994 F.2d 112, 123 (3d Cir.1993))). The court finds that the manufacture and sale of PCBs is not an abnormally dangerous activity as a matter of Pennsylvania law.

### c. Common Law Trespass

 Under Pennsylvania law, "trespass" is defined as unprivileged, *intentional* intrusion upon land in possession of another. *Reynolds v. Rick's Mushroom Service, Inc.*, 246 F.Supp.2d 449 (E.D.Pa. 2003); *Graham Oil Co. v. BP Oil Co.*, 885 F.Supp. 716, 725 (W.D.Pa.1994)(citing *Kopka v. Bell Telephone Co.*, 371 Pa. 444, 91 A.2d 232, 235 (1952))(emphasis added). Pursuant to section 158, one is subject to liability to another for trespass, irrespective of whether one thereby causes harm to any legally protected interest of another, if one *"intentionally* enters land in the possession of another or causes a thing or a third person to do so, remains on the land, or fails to remove a thing which one is under a duty to remove." RESTATEMENT (SECOND) OF TORTS, § 158 [5] (emphasis added). However, "one whose presence on the land is not caused by any act of his own or by a failure on his part to perform a duty is not a trespasser." *Id.* at COMMENT (F).

 "Pennsylvania courts have [also] adopted the section[ ] of the Restatement (Second) of Torts that deal[s] with continuing trespass." *Graham Oil Co.*, 885 F.Supp. at 725 –726 (citing *Mancia v. Department of Transportation*, 102 Pa. Cmwlth. 279, 517 A.2d 1381, 1384 (1986); *County of Allegheny v. Merrit Construction Co., Inc.*, 309 Pa.Super. 1, 454 A.2d 1051 (1982)). Pursuant to section 161, "continuing trespass" is "[t]he actor's failure to remove from land in the possession of another a structure, chattel, or other thing which he has tortiously erected or placed on the land." RESTATEMENT (SECOND) OF TORTS § 161(1). "In order to maintain a claim for continuing trespass, a plaintiff must plead that the defendant committed and continues to commit harm-causing actions, not merely that the harm continues to result from actions which have ceased." *Graham Oil Co.*, 885 F.Supp. at 726.

The precise issue presented here was addressed by the seventh circuit in *City of Bloomington, Ind. v. Westinghouse Elec. Corp.*, 891 F.2d 611, 614 (7th Cir.1989). In that case, the plaintiff City sued Monsanto as manufacturer and seller of PCBs, for damages resulting from the contamination of city's landfill, sewer system and sewage treatment plant from use of the chemicals in the buyer's manufacturing operations. The court held that there could be no trespass absent the actor's intentional entry and referring to Comment j to § 158, explained that "there is no liability where a defendant has caused entry of a third person (here Westinghouse) unless the actor (here Monsanto) intentionally causes the third person to enter land by command, request, or physical duress." *Id.* at 615. Since at the time of the sale of PCBs to Westinghouse, "Monsanto did not know

---

5. Section 158 of the Restatement of Torts provides:

One is subject to liability to another for trespass, irrespective of whether he thereby causes harm to any legally protected interest of the other, if he intentionally

(a) enters land in the possession of the other, or causes a thing or a third person to do so, or

(b) remains on the land, or

(c) fails to remove from the land a thing which he is under a duty to remove.

that Westinghouse would deposit harmful waste on City property," and since "Monsanto certainly did not command, request, or coerce Westinghouse into doing so," the court found the requisite trespassory intent lacking. *Id.* The court emphasized that "in accordance with the Restatement principles, courts do not impose trespass liability on sellers for injuries caused by their product after it has left the ownership and possession of the sellers." *Id.* (citing *Dine v. Western Exterminating Co.*, No. 86–1857, 1988 WL 25511 (D.D.C. March 9, 1988) (chlordane and heptachlor); *City of Manchester v. National Gypsum Co.*, 637 F.Supp. 646, 656 (D.R.I.1986); *Town of Hooksett School Dist. v. W.R. Grace and Co.*, 617 F.Supp. 126, 133 (D.N.H.1984)).

The court adopts the seventh circuit's analysis under § 158. Monsanto did not deposit or compel another to deposit PCB wastes at the Site. Moreover, the court has already found that Monsanto could not reasonably have foreseen that its product would be deposited at the Site. Therefore, Monsanto cannot be liable in trespass.

#### d. State Law Contribution and Indemnification

█ Monsanto is not liable for state law contribution and indemnification. Contribution liability requires a finding that the parties were joint tortfeasors. *See* 42 Pa.C.S. § 8322 (defining "joint tortfeasors" as "two or more persons jointly or severally liable in tort for the same injury to persons or property"). Since Monsanto neither acted in concert with the Metal Bank defendants nor committed any act which united with their acts to form a single injury under federal or state law, Monsanto cannot be a joint tortfeasor.

█ Common law indemnity applies when "a person who, without active fault on his own part, has been compelled by reason of some legal obligation to pay

damages occasioned by the negligence of another." *Graham Oil Co.*, 885 F.Supp. at 727 (quoting *Burbage v. Boiler Engineering & Supply Co.*, 433 Pa. 319, 249 A.2d 563, 567 (1969)). Since the court has found that the damages in question were not occasioned by Monsanto, Monsanto cannot be held liable for indemnification. Accordingly, Monsanto's motion for summary judgment is granted.

### IV. CONCLUSION

An appropriate order follows.